**In the Interest of T. L. C. and T. D. C., children under the age of 17 years.**

### No. 10013.

Missouri Court of Appeals,
Springfield District.

June 28, 1977.

James E. Brown, Joplin, for appellant.

R. Deryl Edwards, Joplin, for respondent.

STONE, Judge.

In this statutory proceeding under our Juvenile Act [§§ 211.011 to 211.431, RSMo 1969, V.A.M.S.], the natural mother of T.L.C. and T.D.C. appeals from the judgment of the juvenile court committing both children, girls then seven and five years of age, respectively, to "the care and custody of the Missouri Division of Family Services for placement in foster homes pending further Juvenile Court hearing."

Four witnesses, namely seven-year-old T.L.C., her mother and stepfather, and the juvenile officer of Jasper County, testified at the hearing in juvenile court upon the amended petition filed by the deputy juvenile officer. At that hearing, the mother and the juvenile officer were capably represented by adversary counsel who in like manner have briefed and presented the case here. In our view of the matter, a brief outline of the factual situation shown by the testimony will suffice.

When the juvenile authorities initially investigated and intervened in September 1974, the mother and the two girls, T.L.C. and T.D.C., were three members of a six-member household unit, the other three members being J.M., the mother's husband in a then three-year-old marriage, and two girls, one of whom was then about eight

months and the other about one year eight months of age, born of that marriage. The natural father of the two girls, T.L.C. and T.D.C., who are the objects of concern in this proceeding, is neither identified nor mentioned in the record.

The primary thrust of the seven-year-old's testimony was directed to a certain occasion (apparently the most recent one) when, in the absence of the mother from the home in the evening and after the two girls were in bed, the stepfather came into the girls' bedroom, "sat on the bed" with them, engaged in sexual exposure and exhibitionism, and insisted that the girls participate in contrectation of his "private" for the apparent purpose of engendering or supporting its tumescence. T.L.C. also testified that the stepfather had engaged in like conduct on other nights, always in the absence of the mother.

The stepfather denied that there had been any such incidents of sexual exposure or exhibitionism, and thereafter under the guidance of the mother's counsel offered a detailed account of the only occasion (so he declared) on which the two girls had glimpsed his "private." As he described that incident, he was in the bathroom between "the girls' bedroom" and "our bedroom," still clothed but "in the process of relieving [himself] there at the toilet," when the girls "shocked" him by entering from the latter bedroom. And, although he "tried [his] best to hide [himself]," when the girls asked "[w]hat is that," he "was dumbfounded because [he had] not had that happen before," so he answered "[t]hat's just my pony tail" and told them to "just forget it, just go on to bed."

The mother asserted that she had no personal knowledge of, and no reason to suspect, any misconduct by her husband, the stepfather, in his relationship with the children. However, she readily conceded that, about one week before the deputy juvenile officer called her, both T.L.C. and T.D.C. had told her that the stepfather "had showed his thing to them" (one of the girls said "in the bedroom" and the other "on the

way back from the baby sitters")—revelations or charges to which her strange and atypical maternal response was that she "told them to go in the other room and think about it and come back and tell me the truth," which worked the not surprising, if not desired, result that they "come back in and said they were only teasing."

The record indicates that the babysitter for the girls (not so ready and willing as the mother to discredit, dispute and discard the girls' statements) brought this family situation to the attention of the deputy juvenile officer of Jasper County who shortly thereafter instituted this proceeding in the juvenile court.

■ On this appeal by the mother from the judgment of the juvenile court, her counsel assigns error in three particulars, to wit, (1) that both the original petition and the amended petition were signed by the *deputy* juvenile officer rather than the juvenile officer himself, (2) that the evidence was insufficient to support the findings and judgment of the court because the testimony of seven-year-old T.L.C. was so vague, inconsistent and contradictory as to be of no probative value, and (3) that "the court erroneously considered as evidence unknown matters told to him by T.L.C. and T.D.C. in chambers" and also out-of-court statements of T.L.C. as reflected and embodied in a typewritten statement prepared by Ellen Wilson, identified as a counselor in the juvenile office.

As for the first two points, suffice it to say that, after consideration in the light of the record and relevant authorities, we are satisfied that each of those points is without merit and that no good purpose would be served by discussion of them here.

The third point requires further attention. At the close of the testimony, the mother's counsel requested and was given permission "to be heard on this matter," which was followed by a fervent and hypercritical statement in which counsel declared, inter alia, that seven-year-old T.L.C. "really said nothing in the course of her testimony," branded that testimony as "utterly incredible" insofar as it pertained to the step-

father's alleged misconduct, and closed with the request that the court rule "that there has been no misconduct; that the welfare of these children have (sic) not been affected in any way, shape or form; and that they are entitled to be restored to the custody of their mother."

To which the court promptly responded in this wise:

"I have here a typewritten statement that was taken from [T.L.C.] by Mrs. Ellen Wilson who is a counselor in the Juvenile Office. I don't know whether you have seen it previously or not, but I have had it marked as Court's Exhibit 1 and it will be admitted and I will let you look at it. Mrs. Wilson is in the office if you desire to question her concerning the statement, and I'll bring her in here at this time and give you an opportunity to cross-examine her on it."

In the ensuing colloquy, the mother's counsel objected to the introduction of this exhibit because (a) "[i]t's hearsay in its most gross form" and (b) "[b]oth sides have rested their case," but the court pointed out that the exhibit already had been admitted and again inquired whether counsel desired to cross-examine Mrs. Wilson, evoking the reply of counsel apparently resigned to the obvious, "[i]t will be of no use, sir."

Whereupon, the court immediately proceeded to this voluntary disclosure:

"*The court will further state that I have talked with both of these girls in my office* and also one of them [T.L.C.] has *been interrogated in the courtroom, and the opinion and what I am writing is based upon all the evidence I have heard in addition to [the stepfather's] testimony.*" (Emphasis ours)

And, without indicated pause, interruption or comment the court then stated his findings, made the two girls wards of the court, and "placed [them] in the care and custody of [the] Missouri Division of Family Services for placement in foster homes pending further hearing."

■ This is a civil proceeding and not a criminal action [§ 211.271] and the *"proce-*

*dure customary in proceedings in equity"* *governed in the juvenile court.* (Emphasis ours) § 211.171(6); *In Interest of R.L.P.,* 536 S.W.2d 41, 42(2) (Mo.App.1976). The welfare and best interests of the involved minor children being of paramount importance and concern not only in juvenile proceedings but also in dissolution of marriage cases and formerly in divorce proceedings, we regard appellate judicial discussions and pronouncements in the latter two categories of cases concerning in camera talks or "visits" with minor children as relevant and persuasive in juvenile proceedings, and particularly so where, as here, disruption of the parent-child relationship and placement in a foster home may result.

Section 18 of our Dissolution of Marriage Code [Laws of 1973, p. 478; § 452.385, V.A. M.S.] provides that, if the court elects to interview a child in chambers "to ascertain the child's wishes as to his custodian and relevant matters within his knowledge", the court shall permit counsel to be present and participate and shall "cause a record of the interview to be made and to be made part of the record in the case." For noncompliance with these requirements, the custodial decree in *Duncan v. Duncan,* 528 S.W.2d 806 (Mo.App.1975), was set aside and the cause remanded.

■ Although prior to January 1, 1974, the effective date of the Dissolution of Marriage Code, there was no statutory provision concerning in camera interviews, talks or visits with minor children, such unrecorded talks in the absence of counsel sometimes became the subject of appellate complaint by counsel and comment by the court. E. g., see *Lipsey v. Lipsey,* 464 S.W.2d 529, 534(8) (Mo.App.1971); *Roper v. Roper,* 461 S.W.2d 330 (Mo.App.1970); *Benjamin v. Benjamin,* 370 S.W.2d 639, 642–643 (Mo.App.1963), each of which was a proceeding to modify the provisions of a divorce decree relating to the custody of minor children. For the purposes of this discussion, suffice it to say that those cases supported the view that, no matter how well-intentioned the trial court might have been, an in camera talk with the minor child or children should not have been conducted.

In the case before us, the court's in camera interview or talk with both T.L.C. and T.D.C. was revealed voluntarily as a fait accompli and apparently as a lead-in to, and further support for, the order making the two girls wards of the court and placing them in the care and custody of the Missouri Division of Family Services for placement in foster homes. Having had no prior knowledge of, and thus no opportunity to be present at, the court's in camera visit with the two girls, certainly counsel could not have been charged with interposing an objection to that of which he was not even aware.

In the stated circumstances, we are constrained to conclude that the cause should be reversed and remanded for further proceedings, not inconsistent with the views herein expressed. Cf. *In Interest of M— C—,* 504 S.W.2d 641, 647 (Mo.App.1974). It is so ordered.

BILLINGS, C. J., and HOGAN, TITUS and FLANIGAN, JJ., concur.