**In the Interest of L. A. H., a Minor.**

**STATE of Missouri, Respondent,**

v.

**H. H. and L. W., Appellants.**

**No. 43232.**

Missouri Court of Appeals,
Eastern District,
Division 3.

July 28, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 21, 1981.

Application to Transfer Denied
Nov. 10, 1981.

William L. Syler, Jr., Cape Girardeau, for appellants.

Michael A. Price, Charles R. Harrison, Cape Girardeau, for respondent.

DOWD, Presiding Judge.

A termination of parental rights case.

This was a proceeding under § 211.447.-2(2) RSMo 1978 terminating the parental rights of appellants H. H. (hereinafter mother) and L. W. (hereinafter father) in their natural child L. A. H. (hereinafter child). The parents appeal. We affirm.

The following facts were developed at the hearings.

The child was born to appellants on May 22, 1978. The appellants are not married to one another although they have lived together for more than three years. At the age of four months, the child was placed with some friends and former neighbors. The appellants reside in Cape Girardeau, while the friends reside in Scott City. The child was placed with the friends because the mother could not take care of her. Furthermore, the father was ill at the time, and her mother (hereinafter grandmother) is mentally retarded. The child was with the friends approximately seven months, during which time the parents did nothing toward getting the child back in the home. No definite arrangements were made for the child to return home, and the appellants only told the friends that they would "even-

tually" want the child back. The parents made infrequent visits and minimal contributions for support; the friends received only $25.00 in cash, $10.00 in food and some clothes during the entire period.

On April 10, 1979 a petition was filed by a juvenile officer asking the court to assume jurisdiction over the child because she was in need of protective services. On April 20, 1979 the court established jurisdiction finding that the child was homeless, dependent and neglected within the meaning of the statutes, and thereby placed her in the legal custody of the Division of Family Services. The child was later placed in a foster home. It was determined that the mother needed instruction on proper childcare and housekeeping before the child could return home. A three month court approved plan was introduced by the Division of Family Services to try and help the mother rectify her problems and make the home safe for the child. The mother was to work with the Division of Family Services and a home management counselor to improve her skills in caring for a child and in running a home. In addition, the grandmother was to find a new place to live, and the parents were to visit with the child and pay child support. At the time of this hearing, the mother was pregnant with her second child S. who was born on June 16, 1979. A second more detailed plan was entered into on September 5, 1979.[1]

Under the second plan the mother was to learn how to clean the house, feed the baby, wash the clothes, store food correctly, bathe regularly, etc. The father was included in this plan in order to help the mother.

A termination hearing was held on March 13, 1980 wherein the following evidence was developed. After working with the mother from May 4, 1979 through October 17, 1980 for approximately 100 hours, the counselor determined that the mother was incapable of rectifying her problems. She felt the mother was insecure with, and afraid to feed the second child S. and that she was negligent in protecting food, and in her health habits. The mother was afraid to bathe the second child S. and would only sponge him causing diaper rash problems. She did not put the dirty diapers in a pail but left them in other areas of the house. Despite a written list provided by the counselor the mother did not mix the baby's formula correctly. The counselor saw roaches in the apartment and observed that the mother would leave needles, pins, and matches laying around. There was no continuity in anything that the mother did nor could she retain methods for more than several days. The mother did try to provide medical attention for S. She took the child to the pediatrician and was faithful in her attentiveness when he had an infection. The mother had also taken the child, L. A. H. to the doctor on several occasions. There was no indication of physical abuse of either child. However, the counselor felt that the mother still needed some form of adult supervision in order to carry on normal functions.

Wendy Ward, a Division of Family Services representative, who worked with the mother and accompanied the child on her visits felt that although there was some improvement under the counselor's instruction, there was no significant change. The house was needlessly cluttered and unsanitary for a child.

Dr. Sanford Fredman, a clinical psychologist testified that on March 15, 1979 the mother had been given a Wechsler Intelligence Scale IQ test and scored a 58. This placed her in the mentally deficient range. Dr. Fredman felt the mother had a great deal of difficulty functioning, that her power to reason was limited, and that she could not make decisions on a consistent basis. In his opinion she was not capable of the necessary functions for successful child rearing.

Dr. Schultz, the treating pediatrician, testified that the mother's perception was diminished and that supervision would be required at all times.

The mother is capable of writing her name and loading a Polaroid camera. She

---

1. Unlike the first plan, this second plan was not approved by the court.

can read a phone book and operate a telephone. She is also capable of treating a slight burn, and of caring for the child, but needs constant supervision. The mother testified she loves the child and wants her back in their home. During her visits with the child, the mother attempted to get the child's attention with cookies and toys. However, there appeared to be no evidence of "bonding" between the mother and daughter.

The father testified he could take a lot of responsibility with the children in order to help the mother. He wants the child back in his home and is willing to work with the Division of Family Services.

The father has been continually employed as a tire repairman at Rhodes City Truck Plaza in Cape Girardeau, earning $144.05 a week. The mother is unemployed but receives a $208.20 monthly supplemental income check. Appellants were financially capable of supporting the child when she was with the friends. Both parents paid child support while the child was in the foster home.

Section 211.447.2(2)(h)b. RSMo 1978 provides, in pertinent part, that:

"The juvenile court may upon a petition filed by the juvenile officer terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and when it appears by clear, cogent, and convincing evidence that: b.) the child has come under the jurisdiction of the juvenile court pursuant to the provisions of § 211.031(1)(a) . . . and thereafter the custody of the child has not been with his parents for six months or longer . . . and the parent has failed, on a continuing basis to rectify the conditions which formed the basis of the petition filed under § 211.031 RSMo 1978 and the order entered under § 211.181 RSMo and there is a reasonable cause to believe that the parent will not, even if given more time rectify those conditions on a continuing basis, and that the . . . division of family services . . . has used reasonable, diligent and continuing efforts to aid the parent to rectify the

conditions and provide on a continuing basis, a proper home for the child."

The court found under § 211.447.-2(2)(h)(b) that although the Division of Family Services had diligently worked with the parents in an attempt to rectify the conditions which formed the basis of the petition, there was reasonable cause to believe that the parents would not rectify those conditions on a continuing basis. The court further found that the best interest of the child would be served by terminating all parental rights of the appellants.

The appellants first contend that the judgment terminating parental rights is not supported by clear, cogent and convincing evidence. We disagree.

The primary concern in these proceedings is the best interest of the child. Here the court in accordance with the statute had set up a plan to rectify the conditions which had resulted in the neglect of the child. Neglect is defined under § 211.-447.2(2)(b) as "The failure of a parent to provide on a continuing basis, the care, guidance and control necessary for the physical, mental and educational well-being of the child." The mother's difficulties in caring for the child, and in running a proper home must be considered when determining what is necessary for the physical well-being of the child. At the first hearing the court considered the mother's mental deficiencies and problems with housekeeping and childcare important enough to approve a plan attempting to rectify the problems.

From the facts adduced at the hearings we find that there was clear, cogent and convincing evidence to support the trial court's determination that the parents were incapable of rectifying these conditions and that it would be in the best interest of the child to terminate the appellants' parental rights.

The appellants next attack the admission of the clinical psychologist's testimony as to his two hour interview with the mother on the grounds that there was a lack of foundation as to his qualifications. The record clearly reflects that a founda-

tion was laid as to the doctor's training and expertise in psychology; specifically, as to his expertise in the psychological processes by which children and adults acquire and use knowledge or experience to function in life, establishing his ability to assess the mother's capabilities for childcare. The weight and credibility of the doctor's testimony lies with the trial judge. There is no merit to this contention.

■ Appellant-mother asserts the novel point that she was entitled to *Miranda* type warnings before being administered the IQ test if the results were to be used at a termination hearing. We have examined the recent case of *Estelle v. Smith*, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) where the defendant underwent a court ordered pretrial psychiatric examination to determine competency to stand trial. The defendant was given no indication that the compulsory examination would be used at the penalty phase of the proceedings. The court held any statements made during said examination were involuntary and that the considerations calling the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychological examination. *Estelle* is not controlling here as proceedings in juvenile court have been held to be civil in nature. *In the Interest of T.L.C. & T.D.C.*, 553 S.W.2d 556 (Mo.App.1977). We reject the appellant-mother's contention.

Judgment affirmed.

CRIST and REINHARD, JJ., concur.