In the Interest of J_____ Y_____,
et al.

No. 63011.

Supreme Court of Missouri,
En Banc.

Aug. 31, 1982.

Peter H. Rea, Branson, for appellant.

Melody A. Bryan, Dept. of Social Services, Jefferson City, for respondent.

HIGGINS, Judge.

William and Lula Bilyeu appeal an order of the Stone County Juvenile Court which terminated their parental rights. They charge error to the court in finding evidence sufficient to terminate parental rights under § 211.447.2(2)(h) a, b, RSMo 1978; in not finding the action of the Department of Family Services defeated the purpose of Chapter 211 as no sincere effort was made to return the children to their home; by allowing the introduction of evidence illegally obtained under U.S. Const. amend. IV; in permitting pursuit of a procedure under § 211.447.2(2)(h) a, b, RSMo

1978, when the case should have been based on § 211.447.2(1), (2)(a) a,b, (b), (c), (d), (e), (f), or (g); and in taking judicial notice of reports and letters received by the juvenile court from the Department of Family Services but not provided to the parents or their attorney. They also attack the constitutionality of § 211.447, RSMo 1978, asserting the statute denies enjoyment of the gains of their industry as guaranteed by Mo. Const. art. I, § 2, that it may be used to require their employment as a condition precedent to restoration of custody of their children. Affirmed.

On March 1, 1979, Glen Chambers of the Department of Family Services received a telephone call from the child abuse and neglect "hotline." The report concerned the Bilyeus' children, J____, T____, T____, B____, A____, and W____. The next morning Mr. Chambers began his investigation of the report. He discovered that William and Lula Bilyeu, the children's parents, had been arrested the previous day on theft charges. He went to Blue Eye School and talked with J____ and T____. Mr. Chambers, accompanied by juvenile officer Jim Wirz, J____ and T____, then went to the Bilyeu home. The four younger children were found in the home of their grandfather and aunt, Sherd and Dottie Bilyeu. Mr. Wirz described the home as "one of the filthiest places I've ever been in." Some of the younger children were clothed only in underwear, wore no shoes, and were very dirty. The youngest children wore no underwear and had severe diaper rash. One child had cradle cap. Another had a burn on his stomach and a severe bruise on his hip. The house smelled of urine. Both men had to go outside several times for fresh air. All of the milk in the house was sour, including that in the baby's bottles.

With Dottie Bilyeu's consent and accompanied by J____, Mr. Chambers and Mr. Wirz then entered the family trailer immediately next door. According to Mr. Wirz it was a toss-up as to which home was filthiest. In the kitchen a dirty, smelly rag was found floating in a sink full of dirty water. Both bedrooms were cluttered with dirty clothes and boxes. Each contained a single bed, one of which was ¾ size. The bedding was dirty. Upon inspection of the bathroom, Mr. Chambers discovered there was no running water. What little food was found in the house appeared inedible.

Based on these conditions, a petition requesting the six children be placed in the custody of the juvenile court was filed. On March 2, 1979, the juvenile court granted temporary custody of the children to the Department of Family Services.

On May 9, 1979, Mr. Chambers wrote the Bilyeus a letter concerning visitation of their children. On June 21, 1979, the Bilyeus and DFS entered a written service agreement. The purpose of such agreements is to set up goals and responsibilities for the parents and DFS. The ultimate objective of these agreements is reunion of the family. This was fully explained to the Bilyeus by Mr. Chambers. Between June 21, 1979, and January 25, 1980, three service agreements were signed by the parties. The first plan was signed on June 21, 1979, and contained the following terms:

## PLAN I

Parents will:

1. Bill will go to Mt. Vernon Chest Hospital for an examination;
2. keep DFS advised of employment;
3. visit the children monthly; and
4. maintain steady employment.

Agency will:

1. make an appointment for Bill at Mt. Vernon;
2. set up visitation schedule; and
3. inform parents of significant events in the children's lives.

Between March 1 and July 31, 1979, Mr. Chambers worked with the children and parents on a regular basis. He submitted a quarterly review to the juvenile court on July 31, 1979, recommending the children continue in foster care. On September 13, 1979, Mr. Chambers informed the Bilyeus by letter that additional improvement was needed before the children could be returned to their care. The letter required

more space for six children and two adults than that currently available; a steady income to support the children and the family; and compliance with community standards in their daily living with specific reference being made to drinking.

A new service agreement was executed between the Bilyeus and DFS on October 5, 1979. The plan set the following requirements:

### PLAN II

Parents will:

1. maintain steady employment;
2. pay child support of $60.00 per month;
3. visit children monthly; and
4. advise agency of employment, health, housing.

Agency will:

1. use child support for children's benefit;
2. set up visitation schedule; and
3. advise parents of significant events in the children's lives.

Once again, Mr. Chambers's quarterly reports concerning the status of the children and the progress of the Bilyeus recommended the children remain in foster care. These recommendations were made based on the Bilyeus' failure to meet the terms of their service agreements. On January 10, 1980, Mr. Chambers wrote the Bilyeus another letter concerning the changes needed before the children could be returned. The Bilyeus were advised that failure to comply with these agreements would result in a recommendation to terminate their parental rights. This letter led to yet another service agreement entered on January 25, 1980, the terms of which were substantially the same as those of the second agreement. Once again the Bilyeus failed to abide by the agreement. Subsequently, a petition for termination of the Bilyeus' parental rights was filed by the Stone County Juvenile Officer. A hearing on the petition was held on March 23, 1981. On March 31, 1981, an order terminating the Bilyeus' parental rights was entered.

█ The appellants assert the presence of several constitutional questions on appeal, including the validity of a statute of this state. Jurisdiction on these grounds is doubtful; however, this case concerns the welfare of several infants, and it is retained for decision in the interest of an early resolution of the infants' situation. *See In re Beste,* 515 S.W.2d 530, 531 (Mo. 1974).

█ Appellants contend the judgment terminating their parental rights is not supported by clear, cogent, and convincing evidence. The primary concern of a termination hearing is the best interest of the child. § 211.011 RSMo (1978). The evidence shows the environment from which the Bilyeu children were removed was injurious to their welfare. The action by the juvenile court in removing the children was proper under § 211.031 RSMo (1978). In order to remedy the situation, the parents and DFS entered into three separate service agreements. The agreements were explained to the parents by a DFS employee and, on at least one occasion, their attorney. The parents testified they understood the goal of the agreements to be the return of their children. They also understood that failure to comply with the agreements would result in a recommendation for termination by DFS. The parents failed to comply with the agreements. The record indicates the parents did make monthly visits with the children, added two rooms to their trailer and made a few support payments pursuant to the agreements with DFS; the remaining terms were consistently violated. Neither parent maintained steady employment nor made an effort to keep DFS informed as to employment. Offers to assist the parents to obtain employment were ignored. Evidence introduced at the hearing indicated the father continued to drink despite agreements to quit. Testimony of both parents indicated a lack of concern for their children's schooling. Support payments were infrequently made despite the father's testimony that he had the money. Neither parent exhibited an understanding of the monetary cost of raising the children. The testimony of the oldest child indicated

that harsh physical punishment had been used in the past; the child stated she was afraid of her parents.

The foregoing provided clear, cogent and convincing evidence in support of the trial court's determination that the parents were incapable of rectifying these conditions and that it would be in the best interest of the children to terminate parental rights under § 211.442 *et seq.* RSMo 1978. *See In re L.A.H.,* 622 S.W.2d 319 (Mo. App. 1981); *In re C____ W____ B____,* 578 S.W.2d 610, 614 (Mo. App. 1979); *White v. De Spain,* 453 S.W.2d 697 (Mo. App. 1970); *Drake v. King,* 446 S.W.2d 445 (Mo. App. 1969).

■ Appellants contend that the action of DFS defeated the purpose of Chapter 211 RSMo in that no sincere effort was made to return the Bilyeu children to their parents. Appellants have misread the statute. The purpose of Chapter 211 "... is to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court." § 211.011 RSMo (1978). Reunification of the family is the desired outcome in situations such as that presented in this case; however, the best interest of the child is controlling. *See In re L.A.H.,* 622 S.W.2d 319, 322 (Mo. App. 1981). The evidence introduced at trial showed that for such purpose DFS continually tried to aid appellants in rectifying unacceptable conditions in their home in a reasonable and diligent manner; and that the parents failed to respond. The purpose of Chapter 211 was neither ignored nor defeated.

■ Appellants contend evidence of the condition of the Bilyeu trailer should have been excluded as it was obtained without a warrant. Mr. Chambers and Mr. Wirz did enter the Bilyeu trailer, and it was inspected in compliance with § 210.145 which calls for a thorough investigation of the children's home environment. No protest was made by Dottie or Sherd Bilyeu when Mr. Chambers asked to see the trailer; Dottie let both men into the trailer. The record indicates the Bilyeu children stayed in both homes frequently and that Dottie and Sherd had access to the parents' trailer home. Under these circumstances, Mr. Chambers and Mr. Wirz were acting within the scope of their investigatory powers under § 210.145 RSMo (1978).

■ Appellants assert the trial court erred in its judicial notice of the reports and letters received by the juvenile court prior to the termination hearing because these reports were not made available to the appellants under the provision that "[A]ttorneys representing parties before the court shall have access to the written report." § 211.472 RSMo (1978). DFS did not try to keep the report from the appellants; the record reflects it was never requested. There is no duty on DFS to provide copies of the report to the parties in a termination hearing. *Id.*

■ Appellants assert they have a constitutional right to enjoy the gains of their industry, specifically, the company of their children. Appellants further argue requiring the parents to seek employment in order to support their children is a violation of the thirteenth and fourteenth amendments.

Neither contention was timely raised by appellants. There is no pleading or argument in the record concerning these issues. They cannot be presented for the first time on appeal: nothing is preserved for review. *State ex rel. Beeler v. City of Raytown,* 439 S.W.2d 481, 482 (Mo. 1969); *State ex rel. Thompson v. Roberts,* 264 S.W.2d 314, 317 (Mo. 1954).

The judgment is affirmed.

All concur.