**In the Interest of P.E.B. and B.R.B., C.B., Appellant.**

No. 14176.

Missouri Court of Appeals,
Southern District,
Division Two.

March 20, 1986.

Motion for Rehearing and to Transfer Denied April 11, 1986.

Application to Transfer Denied May 13, 1986.

Gwendolyn S. Froeschner, Shurtleff & Froeschner, Columbia, for appellant.

John D. Wiggins, Ronald D. White, Rolla, Joseph W. Rigler, Joplin, for respondent.

MAUS, Judge.

On November 21, 1981, C.B. gave birth to an illegitimate son, P.E.B. (P.). On April 27, 1983, C.B. gave birth to an illegitimate daughter, B.R.B. (B.). The children had different fathers. Upon a petition filed October 24, 1984, the trial court terminated the parental rights of the first father upon the basis of abandonment and the second father on the basis of disclaimer and consent. The trial court also found C.B. had knowingly permitted another to abuse those children causing physical or mental injuries repeatedly or continuously. It terminated her parental rights in respect to both children. C.B. appeals.

By her first point, C.B. contends there was no clear, cogent and convincing evidence that she knew her children were being abused or that she permitted such abuse to occur. The following is a summary of the most relevant facts established by the evidence.

In 1983, C.B. and her two children were living with her parents in a town in Maries County. Sometime after July, 1983, because of intolerable living conditions, at the instance of the Maries County Division of Family Services (D.F.S.), C.B. moved from that house. C.B. received A.D.C. by reason of the two children. She also received food stamps. She rented a mobile home in a mobile home court in that community. In November of that year a male, G.N., moved in to live with her and her children.

In that month the children were left in the care of C.B.'s mother. While helping the two-year-old boy at the toilet, she saw bruises on his back side. The grandmother testified the bruises were actually black and blue, "his whole back side was covered and they looked bad to me." C.B. told her mother G.N. did it. On that day C.B. threw G.N.'s clothes outside. He spent the day at the tavern, but came back that night. By an unnamed source, a report of the incident was made to the Maries County D.F.S. A service agreement was pre-

pared whereby C.B. was to abstain from inappropriate discipline and attend counseling. C.B. attended three or four counseling sessions. G.N. attended none.

During the period in question, G.N. drank heavily. He became violent. One night he was drunk and by his fists held C.B. up against the refrigerator. During the three days before May 1, 1984, he broke a door in the mobile home in two, he broke a crib and a window.

In a written statement given by C.B., she related that an unspecified time she and G.N.'s mother "talked about the way he treats the kids." His mother said she would hate to see G.N. get into trouble for the way he treats P. In an attempt to explain this statement on redirect examination, C.B. said they were talking about how G.N. treated his "first" wife and "[s]he ... wanted me to keep my eyes open."

In that statement C.B. also set forth that on undisclosed dates she saw the following: G.N. toss B. on the bed and say, "take care of the brat"; G.N. grab P.'s "arm and fling him into a corner in the process bruising his head and leaving finger bruises on his arms"; G.N. put B. on the floor and "through [sic] her bottle at her"; B. standing in her crib wanting G.N. to pick her up and G.N. would "slap her but [sic] and yank her tell [sic] she let go of the crib [and] lay her down." Also a couple of times G.N. would go into the bathroom and find P. taking a bath and she would hear G.N. slap P. She also related "[h]e'd do things to deliberately scare P. like slaping [sic] P. on the cheeks." On Sunday, April 29, 1984, G.N. had her take a friend home. When she returned, she went into the children's room. "P. had a bloody nose on the inside he had what looked like a rug burn on his nose and for head [sic]." She pulled his cover down "and his pants were down his knees were sticking up in the air." When asked what happened P. replied G.N. scared him.

Without objection, evidence was admitted that P. related to a social worker events that established G.N. had at undisclosed times sexually abused P. It was reported that an examination by Dr. Brian Cysewski, a psychologist, confirmed this sexual abuse.

On May 1, 1984, the two children were taken to a new baby sitter for the first time. The baby sitter saw signs of what she concluded to be abuse. She reported her opinion to D.F.S. of Maries County. The children were taken into custody and examined by physicians at Phelps County Regional Medical Center in Rolla.

The examining physician testified the examination of P. established the following.

He had an abrasion over his forehead that was about three by two centimeters. He had two abrasions over his nose, one on the tip of his nose and one on the left naris. There was some swelling and bruising of the right ear with a laceration that was quite small and didn't require stitches. It appeared to be a rather fresh bruise. He had a bruise on his right eyelid. He had a bruise on his right cheek, anterior to his ear. There was a bruise on the left jaw bone that appeared to be quite old. There was a bruise on his left anterior chest. Bruises on the back; three with the lowest just above the buttocks. Most of the bruises were a dark brown with a green tint, which indicated they were not fresh. However, the bruise on the right ear appeared quite fresh; it was dark and there was swelling and tenderness associated with it.

The examining physician, stating her reasons, concluded the injuries she saw were the result of abuse. She added some of those injuries were fresh and some more than two weeks old.

The examination of B. resulted in the following hospital record.

Notable for a markedly bruised left side of the face with green and dark brown bruises throughout. Also, there is a bruised area on her left eye, above and below. Her left ear is also bruised and there are two small fitting light brown bruises along the spinal column on the back. There is also a small, faded brown bruise on her left anterior chest

and a green bruise on her left abdomen. On her left hip there is an hemangioma (i.e. birthmark) and also notable on examination is that she holds her left leg abnormally and resists movement and cries when it is touched. In terms of her routine examination, both tympanic membranes are full and red.

. . . .

There is a spiral non-displaced fracture of the left tibia at approximately the junctions between the middle and distal thirds.

The extent of these injuries was graphically shown by photographs of the two children taken on May 1, 1984, and entered into evidence. Those photographs show injuries to the infants from which it could be concluded that those injuries were the result of abuse.

A consulting orthopedic surgeon said it would take much force or major trauma to fracture the tibia and that fracture would immediately result in pain. He also said the injuries appeared to be less than a week old. The initial examining physician noted, "[s]he was not moving her leg normally and she would not let you touch it or move it: she cried." Both the initial and consulting physician were of the opinion the injuries to B. were the result of abuse. *Matter of S.J.Z.*, 252 N.W.2d 224 (S.D. 1977).

When first placed in foster care, P. had a fear of all strangers, particularly men. They both displayed a fear of C.B. Upon C.B.'s first visit, P. backed against a chair. B. screamed and would not go to C.B. At one time P. hid from C.B. between the desk and wall. There was no interaction for a long time.

On August 6, 1984, G.N. entered a plea of guilty to a charge of abuse of the two children and was sentenced to imprisonment. On September 28, 1984, C.B. entered a plea of guilty to endangering the welfare of a child by failing to provide proper medical care for her children.

The evidence outlined obviously supports the finding of the trial court that C.B. knowingly permitted G.N. to repeatedly and continuously abuse the children causing physical or mental injury. Nonetheless, she argues it did not provide clear, cogent and convincing proof of that basis for termination.

She does so by first attempting to ascribe the severe injuries to the children to a series of accidents or bizarre events occurring during a two-day "drinking" barbeque in the mobile home park on April 28 and 29, 1984. For example, she accounts for P.'s obvious facial injuries by a fall from a parked pickup truck. The trial court was entitled to find that account of those severe and diversely located facial injuries was absurd.

Second, she accounted for the many bruises to the face of B. by the following.

A. She was crawling up onto the oven and I had biscuits in the oven and it was hot. And my hands were full. I had a knife in one hand and I was peeling potatoes.

Q. Uh-huh.

A. I asked P. to try and catch B.'s attention to get her away from the hot oven and P. evidently whacked her. I heard her hit the floor. My back was facing her.

To suggest a two and one-half year old boy would whack a year old toddler and cause the many, severe and scattered facial bruises described in the hospital record and pictured could be found incredible. Apparently to support this account, she later added that P. had thrown B. out of bed several times.

Thirdly, to account for the fractured tibia of B., the mother related an incident when G.N. attempted to remove the child from an automobile seat belt by her legs. Yet, she added that at the time and at no time thereafter did the baby display any reaction of pain. This is contrary to the medical testimony.

In addition to the attempted explanations, C.B. argues the evidence does not establish she knew of this abuse of the children. C.B. testified G.N. dressed the children before she got up on May 1, 1984.

Her testimony tended to establish she had not seen their bodies for 24 hours. Therefore, she concludes there was no way she could have known of injuries inflicted by abuse during that period. The fallaciousness of this conclusion is established by the facts recited above.

In addition, somewhat in the same vein, she attempts to excuse herself by saying she had no place to go. However, she later added if G.N. had gotten too rough she "would have called the cops on him or went over to my mom and dad's." This argument also ignores the fact she rented the mobile home. She testified she had thrown G.N. out of the mobile home seven times. She failed to call a local law officer she knew for assistance. The trial court was not required to accept her exculpatory testimony. *In re Adoption of W.B.L.*, 681 S.W.2d 452 (Mo. banc 1984). It did not do so.

■ C.B. has apparently presented her case upon the basis that the condition delineated in § 211.447.2(2)(d), RSMo Cum.Supp. 1984 (now amended RSMo Non-Cum.Supp. 1985), could be established only by proof that she gave express approval for each infliction of injury or at least had knowledge of each injury when it occurred. The meaning of the terms "knowingly permit" as used in that subsection is not so restricted. It is not necessary to fully express that meaning. As so used those terms embrace a knowing exposure of a child to reasonably anticipated abuse or a failure to protect a child from such abuse. Cf. *In re J.O.*, 372 S.W.2d 512 (Mo.App.1963); *In re Corrigan*, 134 Cal.App.2d 751, 286 P.2d 32 (1955); *In re Interest of Carlson*, 207 Neb. 540, 299 N.W.2d 760 (1980). Also see *Matter of A.I.*, 289 N.W.2d 247 (N.D.1980), in which the court stated: "The obvious extent and appalling nature of the child's injuries, however, indicate that appellant knew or should have known of her condition. This fact, coupled with his failure to seek medical attention for the child's injuries, leads us to conclude that the findings of the trial court were not clearly erroneous." Id. at 248.

Condonation of such abuse is also evidence of the condition set forth in § 211.-447.2(2)(d). "The Natural Mother owed these children a duty to protect them and to report their abuser." *In Interest of S.D.S.*, 648 S.W.2d 351, 353 (Tex.App.1983). Also see *Dornburg v. McKellar*, 204 Ga. 189, 48 S.E.2d 820 (1948); Annot., Termination of Parental Rights for Abuse, 53 A.L.R.3d 605 (1973); Annot., Parental Rights—Sexual Abuse of Child, 58 A.L.R.3d 1074 (1974).

Shortly after her son was exposed to G.N., C.B. had actual knowledge he beat her son. She was warned about G.N. by his mother. He frequently displayed his tendency for violence. C.B. saw the acts of abuse which were reported in her own statement. Yet she failed to move away or cause G.N. to move out. She failed to seek protection or report the abuse of her children.

Her failure is emphasized by the injuries found on May 1, 1984. Evidence established those injuries were inflicted over at least a two-week period. She had to be aware of most, if not all, of those injuries. She knew G.N. was drinking heavily during the two-day barbeque. She did nothing but cause her children to continue to be exposed to abuse by G.N.

C.B. provided evidence of the abuse, her knowledge and her condonation, when at trial she belatedly said, "I wouldn't have let it gone on that much longer." Her first point is denied.

By her second point, C.B. contends there was no evidence that the termination of her parental rights was in the best interests of the children. To support this point she cites her love for the children and her efforts to improve herself. There was evidence that, with the encouragement of the Boone County D.F.S., she made several visits to the children. She also found employment and sent some money for the children's support.

■ It should not be necessary to observe those factors are not alone controlling. They must be considered as part of

all the evidence. *Interest of H.J.P.*, 669 S.W.2d 264 (Mo.App.1984). Even though reunification of the family is the desired outcome in these situations, the best interests of the children are controlling. *In the Interest of J____ Y____*, 637 S.W.2d 670 (Mo. banc 1982). The "best interests of the children" is "among those 'imprecise standards that leave determination unusually open to the subjective values of the judge,' *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982)." *J.H.H. v. J.D.*, 662 S.W.2d 893, 897 (Mo.App.1983). There was substantial evidence to support the determination of the trial court. The second point has no merit.

C.B. next contends the trial court erred in not granting her a change of venue for cause under Rule 51.04(a). In an "Application for Change of Venue for Cause" she applied for a change of venue under Rule 51.04. She alleged the inhabitants of Maries County were prejudiced against her, the D.F.S. had an undue influence over the inhabitants and because of threats she did not feel safe in court in that county.

■ To support her point she cites *State ex rel. R.L.W. v. Billings*, 451 S.W.2d 125 (Mo. banc 1970). She correctly argues "[t]he promulgation of Civil Rule 51.03, V.A.M.R., however, had the effect of superseding § 508.090 which dealt with the same procedural subject." Id. at 126. It is also true *Billings* held that a juvenile delinquency proceeding was a civil action within the meaning of that rule. However, *Billings* does not support her point. The Rule 51.03 under consideration in *Billings* dealt with both change of venue and disqualification of judge. See Rule 51.03, RSMo 1969. *Billings* held a judge may be disqualified in such a juvenile proceeding. It did not hold a party was entitled to a change of venue under present Rule 51.03 or Rule 51.04.

Assuming they are applicable to a proceeding for termination of parental rights (see Rules 110.01 and 126.01 and *In the Interest of D.J.B.*, 704 S.W.2d 217 (Mo. 1986) Rule 51.03 and Rule 51.04 each in part provide "[a] change of venue may be

ordered in any civil action *triable by jury* ... ." (Emphasis added). An action to terminate parental rights is *triable by the court.* §§ 211.447 to 211.457. The trial court did not err in denying a change of venue under Rule 51.04.

■ By her next point C.B. contends "the trial court erred in ordering termination of parental rights in this case because there were less restrictive alternatives available and the termination ordered denied natural mother [t]he due process of law under the Fourteenth Amendment." To properly present and preserve a claim of constitutional error, that claim must be raised at the earliest possible opportunity with designation of the constitutional provision alleged to have been violated and a statement of facts showing such violation. *Gray v. City of Florissant*, 588 S.W.2d 722 (Mo.App.1979). C.B. did not in that manner present and preserve a constitutional claim of error. Her point presents nothing for review. In *Interest of J____ Y____, supra.*

However, it is appropriate to observe that her argument under this point is merely a restatement of her arguments under points I and II. She contends there are other alternatives to termination. She adds "[t]he relationship between mother and child is almost sacred. Born of her body and entrusted to her care by the nature of things, she is the children's natural protector and ally."

The term due process as used in the Fourteenth Amendment is elusive and incapable of concise definition. 16A Am. Jur.2d Constitutional Law § 807 (1979). The term does embrace both procedural and substantive aspects. Id. § 812. Independent research has found no case which even suggests the state does not have a compelling interest in terminating parental rights under the statute and evidence upon which the court acted in this case. Those interested may see Annot., Termination—Parental Rights, 22 A.L.R.4th 774 (1983). C.B. was accorded the procedural due process of notice and hearing. Upon substantial evidence the court determined she was

not, as she stated, "her children's natural protector and ally." But, to the contrary, she knowingly permitted repeated or continuous abuse causing physical or mental injury to those children by another. C.B. was not denied due process.

■ By her last point of error, C.B. claims the trial court erred because she and the Boone County D.F.S. had entered into a 90-day service agreement with her which had the effect of barring termination and she was complying with the provisions of that agreement. This case involves the D.F.S. of three counties. Involvement of D.F.S. of Maries County before May 1, 1984 has been stated. On July 2, 1984, the Juvenile Division of the Circuit Court of Maries County found the children to be in need of care and treatment and placed them in the custody of D.F.S. of that county. The children were then placed in foster home care in Phelps County for medical and psychological treatment. Under the supervision of the D.F.S. of Boone County, C.B. was accepted from the Maries County jail for rehabilitation at a shelter for battered women. On August 17, 1984, D.F.S. of Boone County entered into a 90-day service agreement providing for "beginning steps to regain custody" of the children. There is no showing this plan or its predecessor had ever been approved by the court.

C.B. argues that the 90-day service agreement was a valid contract. She asserts that Boone County was the case manager and therefore the agreement bound D.F.S. in all three counties. There was an apparent misunderstanding between the D.F.S. officers. At a meeting of the three, the Boone County representative learned that they (apparently Maries County D.F.S. and the juvenile officer) intended termination from the very beginning. That representative testified, "A case plan was then drawn up stating that termination was the ultimate goal." Further, it is not clear how such an agreement could be construed to be a contract purporting to bar termination. It was established a satisfactory performance of the agreement by C.B.

could only result in a recommendation by D.F.S. to the court. However, even if it is assumed that it could be so construed, the 90-day service agreement does not oust the juvenile division of jurisdiction.

Section 211.447, RSMo Cum.Supp.1984, provided eight conditions upon the basis of which the juvenile division could terminate parental rights. Only under § 211.447.-2(2)(b) defining "neglected" in circumstances where a child was not in the legal or actual custody of the parent, is failure to comply with an approved plan a prerequisite to termination. Section 211.447.2(2)(d) authorized termination upon the basis of knowingly permitting repeated or continuous abuse causing physical injury or mental injury to a child. That subsection contained no reference to an approved plan or agreement.

Section 211.447.2 provided the juvenile division could terminate parental rights if *one* or more of the eight conditions was found to exist. While he could have acted more promptly under § 211.447.1, the juvenile officer was authorized to file a petition for termination upon the basis of § 211.-447.2(2)(d). The fact C.B. may have been reasonably complying with a service agreement did not deprive the juvenile division of jurisdiction to terminate her parental rights upon the basis of the condition defined in § 211.447.2(2)(d). The judgment of the juvenile court that such condition was established by clear, cogent and convincing evidence is supported by substantial evidence. *In re J.O.*, supra. That judgment is affirmed.

PREWITT, C.J., HOGAN, P.J., and CROW, J., concur.