**In the Interest of M.H. and N.H.**

**STATE of Missouri, Petitioner–Respondent,**

v.

**R.W.H. and T.B.H., Respondents–Appellants.**

**Nos. 18292, 18293.**

Missouri Court of Appeals,
Southern District,
Division Two.

July 27, 1993.

Motion for Rehearing and Transfer
Denied Aug. 18, 1993.

Application to Transfer Denied
Sept. 28, 1993.

William A. Wear, Jr. and James R. Sharp, Wear, Karchmer & Nelms, Springfield, for respondents-appellants.

F. Richard Van Pelt and Kay A. Van Pelt, Van Pelt & Van Pelt, P.C., Springfield, for petitioner-respondent.

GARRISON, Judge.

This is an appeal by both natural parents (hereafter referred to as Father and Mother) from the juvenile court's order terminating their parental rights to M.H. and N.H. (their two minor children). The order of termination was entered pursuant to § 211.447.2(2).[1]

Father and Mother, in a joint brief, allege the juvenile court erred because there was insufficient evidence to establish grounds for termination of their individual parental rights under § 211.447.2 and to establish that termination was in the best interests of the children, considering the factors contained in § 211.447.3.

M.H. was born August 12, 1989, and N.H. was born July 7, 1991. There was no

evidence of direct physical abuse or any injuries sustained by M.H. All such evidence related to N.H., who was born six weeks premature and who first experienced documented apnea (cessation of breathing requiring external stimulus for resumption) at one month of age.

On September 6, 1991, N.H. was apparently in the bathtub with Mother when he stopped breathing. She summoned Father, who revived the baby by using mouth-to-mouth resuscitation and CPR. N.H. was taken to St. John's Regional Health Center in Springfield, Missouri, where 100 cc's (approximately three and one-half ounces) of clear liquid was extracted from his stomach. A physician specializing in pediatric critical care testified that one of the main findings was low sodium "which could best be explained by water intoxication, swallowing water while in the bathtub."

Mother at first denied that N.H.'s head had gone under the water. The pediatrician's initial concern was the possibility of an intentional submersion and he caused the situation to be "hotlined." The "hotline" report was investigated by a Division of Family Services (DFS) worker. Mother originally told the DFS worker she did not believe N.H. had gone under the water, and said the fluid could have come from a diluted formula. Five days later, Mother told her N.H. had been lying on top of her in the bathtub, he had slid down when she reached for the soap, and his head went partially under the water. This explanation was initially found acceptable by the physician and N.H. was released to his parents when discharged from the hospital. As will be seen, the doctor later changed his opinion about the cause of the water intoxication.

N.H. was again taken to St. John's Regional Health Center on September 18, 1991, by ambulance. At that time, his diagnosis included a subdural hematoma, a contusion of the right hemisphere, seizures, several bruises, and petechiae (fine, red, dot-like appearances caused by rupture of blood vessels) on the top of the head and under the chin. The hospital personnel, as

---

1. All references to statutes are to RSMo 1986, V.A.M.S.

well as DFS workers, were told that Father had left Mother and the two children at the home of his mother-in-law while he looked for work. When he returned approximately two hours later, Mother had taken N.H. to the hospital. Mother said that N.H. had an apneic episode in which he stopped breathing, turned pale, and his arms and legs stiffened. She called her mother and N.H. was shaken and his foot was pinched in an effort to revive him.

The same pediatric critical care specialist again cared for N.H. during the second hospital admission. He testified the conditions were life-threatening and that N.H. may very well have neurological injuries as a result. He further testified that the physical stimulus necessary to cause resumption of breathing during an episode of apnea could include shaking, pinching or even striking; that all of the cerebral injuries could have resulted from striking, shaking or strangulation; and he did not recall whether N.H.'s apnea monitor indicated an apneic episode had occurred that day.[2] While he said the bruise in the ear was caused by striking, he gave his opinion that a single accidental blow could not have caused all of the cerebral injuries he diagnosed. He concluded that the injuries resulted from multiple events.

The doctor discounted the possibility that N.H.'s injuries occurred as a result of being struck during an apneic episode because, unlike most parents in that situation, neither parent here claimed that form of stimulus was used. One account was that N.H. had stopped breathing and the grandmother had shaken him in an effort to revive him. The pediatrician testified that the grandmother's demonstration of how she shook N.H. did not include the type of shaking that would account for all of these injuries. The doctor also said the Father's statement that M.H. may have thrown a toy and struck N.H. would not account for all the injuries. He concluded that the second hospitalization resulted from shaking and battering injuries. The

second hospitalization also caused him to believe that the water intoxication incident causing the first hospitalization had been intentional. He testified, for instance, that one big gulp would not account for 100 cc's of fluid in the baby's stomach, but rather it would take six to thirty minutes for a newborn to ingest that much fluid.

A pediatric neurologist was consulted concerning N.H. on September 19, 1991. At that time, N.H. was critically ill, in a coma, and having seizures. He testified that N.H. had the "classical symptoms of a shaken baby syndrome"; a violent shaking would be required to cause injuries of this nature; and that in his opinion these injuries did not occur during attempts to revive him from an apneic episode. When he talked with Father and Mother, neither admitted to having shaken N.H., but he admitted that he really could not recall exactly what they told him except that he had just quit breathing and was stiff on the right side of his body.

A "hotline" investigation was also conducted in connection with the second hospitalization. It was during the second hospitalization that Father told DFS workers that Mother had sniffed nail polish for about two years, but that it stopped on the day N.H. was discharged from the hospital for water intoxication because he removed the nail polish from the home.

M.H. was placed in the temporary legal custody of the Division of Family Services on September 23, 1991, and N.H. was similarly placed on October 17, 1991 when discharged from the hospital. At the request of the DFS, both Father and Mother were evaluated by a psychologist, who had a Ph.D. but was not yet licensed in the State of Missouri. He was of the opinion that Father made a genuine effort to cooperate fully in the psychological evaluation, has average intelligence, makes impressive efforts to do well, but has the potential to exclude information to fit his conceived notion of reality. Mother was diagnosed as being severely disturbed and evidencing

**2.** Apparently an apnea monitor was provided for N.H. when he was originally diagnosed with that condition. Although it is not fully explained in the record, we gather that the monitor sounds an alarm when breathing stops.

minimal understanding about her need for help. The psychologist was of the opinion that Mother was in need of treatment intervention, without which her ability to take care of herself and her children would be in jeopardy.

A petition was filed on September 24, 1991 alleging that M.H. was without adequate and proper care, custody, support, supervision, and parenting, and that the environment in the parental home was detrimental to his well being because of the injuries suffered by N.H., which were believed to be non-accidental and the result of intentional "shaking and battering" by persons in the home, and which "gives evidence that the emotional and physical safety of said juvenile would be in danger if returned to the parental home." A similar petition was filed October 17, 1991 with reference to N.H. Those allegations were found to be true by the trial court at a jurisdictional hearing on November 7, 1991.

On February 5, 1992, the Greene County Juvenile Office filed a Petition To Terminate Parental Rights in which it sought to terminate Father and Mother's parental rights to both N.H. and M.H. A hearing on the petition was held on April 23, 1992, at which the trial court heard testimony of the pediatric care specialist, the pediatric neurologist, the psychologist, several DFS personnel, and Father. Neither Mother nor her mother testified. On July 15, 1992, the trial court entered its Findings of Fact, Conclusions of Law, and Amended Order Terminating Parental Rights. In that order, it found, among other things, that: the children had been adjudicated abused and neglected as required by § 211.447.2(2); Mother had a chemical dependency which prevented her from consistently providing the necessary care, custody, and control of the children; both Father and Mother had repeatedly or continuously failed to provide adequate food, clothing, shelter, education, care, custody and control of the children, including the failure to provide financial support or necessities of life while in foster care; and that both the Father and Mother had committed a severe act or recurrent

acts of physical and/or emotional abuse towards N.H., who was a person in the family of M.H. It is that order from which this appeal flows.

The termination of parental rights is governed by §§ 211.442–211.487. The juvenile court may terminate parental rights if it finds the termination would be in the best interests of the child and it appears by clear, cogent and convincing evidence that one or more of the grounds for termination under § 211.447.2 exist. Evidence is clear, cogent and convincing when it "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Interest of A.L.B.*, 743 S.W.2d 875, 879 (Mo.App.1987).

An order of termination is to be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless the trial court erroneously declared or applied the law. Rule 73.01;[3] *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *In Interest of J.M.*, 815 S.W.2d 97, 101 (Mo.App.1991). While it is our duty to determine whether the juvenile court applied the correct standard of proof, we must also give due regard for the opportunity of the juvenile court to judge the credibility of witnesses. *In Interest of R.A.M.*, 755 S.W.2d 431, 435 (Mo.App.1988). In reviewing the sufficiency of the evidence, that evidence and all reasonable inferences which may be drawn from it are considered in the light most favorable to the judgment. *In Interest of B.C.H.*, 718 S.W.2d 158, 160 (Mo.App.1986). A judgment will be reversed only when the reviewing court is of the firm belief that it is wrong. *Id.*

In Point I, it is alleged that the evidence did not clearly, cogently and convincingly establish a statutory basis for terminating Mother's parental rights to M.H. and N.H. Specifically, it is argued:

(a) No evidence directly related [N.H.'s] injuries to [Mother], as the only

---

**3.** All references to rules are to Missouri Rules of Court, V.A.M.R.

evidence was that of two treating physicians based on their conclusions and not on eyewitness testimony.

(b) There was no evidence that [M.H.] was ever harmed or placed in danger by [Mother] or that any injuries sustained by [N.H.] adversely affected [M.H.].

(c) There was no evidence that [Mother], at the time of trial, had a chemical dependency which prevented her from providing appropriate care of the children or, if she did, that it could not be treated to enable her to provide such care.

(d) There was no evidence that [Mother] repeatedly or continuously failed to provide the children with support, but rather, that she and [Father] paid the court-ordered child support of $1.00 per week in a lump sum, together with furnishing clothes and toys.

Section 211.447.2 provides, in part:

The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer ... if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

....

(2) The child has been adjudicated to have been abused or neglected. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

....

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse to-

ward the child or any child in the family....

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education....

One of the juvenile court's findings was:

That said biological mother and father committed a severe act or recurrent acts of physical and/or emotional abuse toward [N.H.], a child in the family of [M.H.], or by another under circumstances that indicate they knew or should have known that such acts were being committed toward [N.H.]. That these acts consisted of but are not limited to striking said minor child about the head and body causing injuries such as visual red petechiae on the top of his scalp, a purple bruise on the inner part of his right ear which extended downward and was visible on both surfaces of the ear, a small purple bruise under his right eye and under his chin bruising on his left arm and lower extremity, and a diagnosis subdural hematomas resulting from a striking or shaking of said minor child. That these acts occurred during a period while said minor child was in the sole physical custody of said biological mother and biological father.

In addition, said child was hospitalized on 9–6–91 with a diagnosis of water intoxication without explanation. That evidence was presented that established this incident was an attempted drowning.

That when these injuries were examined in their entirety, the injuries were serious and recurrent.[4]

 In Point I(a), Mother contends the trial court erred in terminating her parental rights because no eyewitness testimony was produced at trial relating N.H.'s injuries to any act or neglect by Mother and that the only evidence on the subject came from two treating physicians who based their conclusions on examinations after the

---

**4.** Discussion concerning the sufficiency of the evidence to support this finding as to Father

will appear later in this opinion.

fact. Mother, however, cites no authority for the proposition that eyewitness testimony is required. Substantial evidence of abuse authorizing termination of parental rights can come from the testimony of a physician. *See In Interest of J.A.J.*, 652 S.W.2d 745 (Mo.App.1983).

The argument here is directed to the sufficiency of the evidence to authorize a finding of abuse of N.H. There is no question but that the injuries diagnosed during N.H.'s second hospitalization were life-threatening and probably have caused permanent damage. There was evidence from which the court could find that they occurred while N.H. was in the actual physical custody of Mother; that the bruise in N.H.'s right ear could only have occurred from having been struck; and that the subdural hematoma and related conditions were the result of a "shaken baby syndrome."

We are cognizant of the fact that N.H. suffered from apnea which could cause a spontaneous cessation of breathing requiring external stimulus for resumption. We are also aware that some of the accepted stimuli is shaking or even striking. Here, however, respondent sustained its burden of proof by introducing evidence from which the court could find that these serious injuries occurred while N.H. was in the actual physical custody of Mother. Respondent was not required to negate every possible reason for the injuries in order to sustain its burden of proof. *See In Interest of B.C.H.*, 718 S.W.2d at 162. Credibility of witnesses and the weight to be given their testimony was a matter for the juvenile court. *In Interest of S———A———J———*, 818 S.W.2d 690, 699 (Mo.App.1991). Likewise, Mother could have come forward with contrary evidence or an explanation for how the injuries occurred but failed to do so. *See D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985); *In Interest of L.M.*, 807 S.W.2d 195, 199 (Mo.App.1991). Under the circumstances of this case, we believe there was evidence from which the juvenile court could find clear, cogent and convincing evidence that Mother abused N.H. and that

his best interests compelled the termination of Mother's parental rights. We deny Point I(a).

In Point I(b), it is argued that the trial court erred in terminating Mother's parental rights to M.H. because there was no evidence that he was ever harmed or placed in danger by any act or neglect of Mother. That proof is not necessary to justify termination. Section 211.447.2(2)(c) states that if a child has been adjudicated as having been abused, the juvenile court is required to consider and make findings concerning "[a] severe act or recurrent acts of physical ... abuse toward the child or any child in the family...." Numerous cases authorize termination of parental rights to a child based upon abuse of that child's sibling. *D.G.N. v. S.M.*, 691 S.W.2d at 912; *In Interest of R.A.M.*, 755 S.W.2d at 435; *In re Interest of A.L.B.*, 743 S.W.2d at 882. This is true even though there is no evidence of injury to the child in question and all of the evidence deals with abuse of one or more siblings. *In Interest of S.D.W.*, 702 S.W.2d 527 (Mo.App.1985); *In Interest of J.A.J.*, 652 S.W.2d 745, *supra*. In fact, parental rights have been terminated as to a child not yet born at the time his siblings were abused. *D.G.N. v. S.M.*, *supra*.

Mother argues that the cases of *In Interest of S.D.W.* and *In Interest of J.A.J.*, *supra*, are distinguishable because they involved evidence demonstrating a clear and present danger to the children as a result of the abuse to their sibling. In neither case, however, was there evidence of any danger to the non-injured child other than the fact that one or more siblings had in the past suffered abuse. The best interests of the child is an imprecise standard that leaves determination unusually open to the subjective values of the judge. *In Interest of P.E.B.*, 708 S.W.2d 315, 320 (Mo.App.1986). A conclusion that termination is in the best interests of the child is a conclusion based upon the evidence, and is necessarily based upon the evidence which establishes grounds for termination. *R.L.P. v. R.M.W.*, 775 S.W.2d 167, 171 (Mo. App.1989). We are unable to conclude that, under the standards of review dis-

cussed earlier in this opinion, the juvenile court erred as contended in Point I(b). We, therefore, deny that point.

■ Inasmuch as we have concluded the juvenile court's order terminating the parental rights of Mother to N.H. and M.H. should be affirmed based upon the evidence and the court's finding of abuse as to N.H., we need not discuss Mother's contentions in Point I(c) and (d). The existence of but one of the statutory grounds is sufficient for termination of parental rights if that result would be in the best interests of the child. *In Interest of D.C.H.*, 835 S.W.2d 533, 534 (Mo.App.1992); *In Interest of L.M.*, 807 S.W.2d at 199.

In Point II, it is argued that the juvenile court erred because the evidence did not clearly, cogently and convincingly establish the statutory grounds for termination of Father's parental rights under § 211.447.2. Specifically, it is argued:

(a) There was no evidence relating [N.H.'s] injuries to any act or neglect by [Father].

(b) There was no evidence that [M.H.] was ever harmed or placed in any danger by any act or neglect by [Father].

(c) There was no showing that [Father] failed to provide [N.H.] and [M.H.] with support.

■ Our review of the record leaves us with the conclusion that there was insufficient evidence to authorize the termination of Father's parental rights to either N.H. or M.H. Rather, the evidence showed that Father was not in the room with N.H. and Mother during the bathtub incident, nor is there any evidence that he was present when N.H. suffered the life-threatening injuries which resulted in his second hospitalization. Beyond that, there is absolutely no evidence that any conduct by Father subjected M.H. to any abuse or neglect.

Section 211.447.2(2) authorizes termination of parental rights if a child has been adjudicated as abused or neglected and if there is a severe act or recurrent acts of physical abuse toward the child or any child in the family by the parent, "or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family...." Our review of the record presented on this appeal fails to disclose any evidence which would meet the "clear, cogent and convincing" standard required to terminate the parental rights of Father on this basis.

The juvenile court also found:

That said biological mother and biological father have repeatedly or continuously failed to provide the said minor children with adequate food, clothing, shelter, or education as defined by law or other care, custody, and control necessary for their physical, mental, or emotional health and development, although physically or financially able. That said biological mother and biological father have failed to provide any financial support or necessities of life for said minor child while in foster care, and the necessary emotional, mental, or other appropriate care due to the lack of a safe, nurturing home environment.

This finding is presumably pursuant to § 211.447.2(2)(d) authorizing termination of parental rights to a child previously adjudicated as abused or neglected and where there is:

Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for his physical, mental or emotional health and development.

■ The only evidence concerning financial support was with reference to monies agreed to be paid during foster care. On November 7, 1991, a Treatment Plan was agreed to by which Father and Mother were to pay "$1.00 per week per child until Child Support Enforcement Unit determination is made." The evidence was that their first payment under that plan was $35.00 on February 7, 1992. Father's undisputed testimony was that it seemed agreeable when he had asked one of the DFS workers if it was satisfactory for him to pay a

couple of months at a time because the payments needed to be by cashier's checks and "they cost money." There was also evidence that Father and Mother delivered clothing and toys to the children during visits supervised by the DFS. The finding also ignores the fact that there was no evidence concerning Father's financial or physical ability to do any more than he had done in the way of financial support.

▆▆▆▆ No authority is cited to us which would authorize the termination of one parent's rights merely because the evidence was sufficient to require termination as to the other parent. By § 211.477.2, the legislature provided, in part:

> ... if the conditions specified in section 211.447 are found to exist as to only one parent, the rights of only that parent with reference to the child may be terminated and the rights of the other parent shall not be affected.

This obviously contemplates that termination of the parental rights of one parent does not require terminating the rights of the other parent. Where there is insufficient evidence to clearly, cogently and convincingly establish compliance with the statutory standards for termination of one person's parental rights, as there was here, the juvenile court is without authority to sever those rights. The court may reach the issue of the best interests of the children only after it has made a determination that one or more of the statutory grounds for termination exists. *In Interest of R.H.S.*, 737 S.W.2d 227, 236 (Mo.App.1987); *M.L.S. v. C.S.*, 710 S.W.2d 452, 453 (Mo.App.1986); *In re Adoption of M.D.L.*, 682 S.W.2d 886, 888–89 (Mo.App.1984). Parental rights may not be severed because the children would be better off in another home. *In Interest of D.C.H.*, 835 S.W.2d at 534.

▆▆▆ We are acutely aware that the permanent termination of a parent-child relationship is an awesome exercise of power by the State. *In Interest of J.A.J.*, 652 S.W.2d at 748. It is, therefore, fitting that

the gravity of parental termination requires strict and literal compliance with the applicable statutes. *In Interest of B.C.H.*, 718 S.W.2d at 160. The importance of the issues in such cases, not only to the individuals involved but to society as well, requires that the appellate court review the issues on appeal and strictly apply the statutory standards established by the legislature. Since we find no clear, cogent and convincing evidence to support termination of Father's parental rights, we are constrained to reverse the juvenile court's order as it relates to Father's rights in N.H. and M.H.

▆▆▆ We have agonized over this opinion and the obvious fact that the result reached is undesirable for several reasons. Nevertheless, it is unacceptable for Father's parental rights to be terminated where the evidence fails to disclose a statutory basis for that result. The juvenile officer, as petitioner, bears the burden of proof. *In Interest of W.F.J.*, 648 S.W.2d 210, 214 (Mo.App.1983). This burden of proof is met if substantial evidence (evidence which, if true, has probative force upon the issues) is clear, cogent and convincing on the issues. *In Interest of J.A.J.*, 652 S.W.2d at 748. In the instant case there was no evidence introduced which would establish grounds for termination of Father's parental rights. The evidence dealt solely with injuries which occurred to N.H. while in the actual physical custody of Mother. There was no showing that Father knew or should have known of any acts of abuse which would authorize termination pursuant to § 211.447.2(2). In fact, when Father testified, the only question asked on cross-examination dealt with whether he had considered letting his parents adopt the children and had nothing to do with any act or knowledge which might have established any basis to terminate his parental rights.[5]

The result we reach in the instant case has been applied in other cases, even though it was recognized that it could be

---

**5.** His testimony on direct examination also failed to provide any basis to terminate his parental rights.

impractical to terminate a mother's rights, but not that of the father, where they still had an ongoing relationship. *See In Interest of S.D.W.*, 702 S.W.2d at 528. We are cognizant of the unfortunate and perhaps unworkable situation this result could create, especially if extended to requiring return of the children to the home jointly occupied by both Father and Mother. As we will indicate later in this opinion, that result is not what is contemplated or intended at this time.

In Point III, both Father and Mother allege that findings made by the juvenile court pursuant to § 211.447.3 were not supported by clear, cogent and convincing evidence and therefore the court erred in terminating their parental rights as to both of said children. Section 211.447.3 requires that the juvenile court, in considering whether to terminate parental rights under that statute, shall evaluate and make findings on certain factors when appropriate and applicable to the case. The juvenile court, in the instant case, made findings on five of the seven factors listed in the statute. Those findings were:

a. That said minor children exhibit no emotional ties to their biological mother or biological father.

b. That said biological mother and biological father have failed to pay for the care and maintenance of said minor children while in the custody of the Division of Family Services.

c. That there are no possible services available that would possibly bring about lasting parental adjustment enabling the return of said minor children to their biological mother or biological father within an ascertainable period of time.

d. That said biological mother and biological father have exhibited an obvious disinterest and lack of commitment to said minor children as evidenced by their disregard for the safety and welfare of said minor child.

e. That said biological mother and biological father committed deliberate acts that they knew or should have known would subject said minor children to a substantial risk of physical or mental harm. That the injuries detailed in finding 7.b. did subject the said minor children to a substantial risk of physical or mental harm.

We agree with Father and Mother that there was insufficient evidence to support the findings in subparagraphs a., b. and c. We also fail to find evidence in the record to support findings d. and e. as they relate to Father. We do believe that the findings made in subparagraphs d. and e. as they relate to Mother are supported by evidence in the record which, as discussed earlier in this opinion, rises to the level of clear, cogent and convincing.

The statute leaves it to the trial court's discretion to make findings on the factors it deems applicable to the case. *In Interest of L.M.*, 807 S.W.2d at 199. Our review is limited to an abuse of that discretion. *In Interest of C.M.W.*, 813 S.W.2d 331, 334 (Mo.App.1991); *In Interest of R.H.S.*, 737 S.W.2d at 238. We find that discretion was not abused as to the findings in subparagraphs d. and e. as they relate to Mother. Inasmuch as either subparagraph, alone, would be sufficient to support a finding that termination was in the best interests of said children, we need not discuss the court's other findings under § 211.447.3 as they relate to Mother.

Our review of the record does not, however, reveal substantial evidence to support the findings under subparagraphs a. through e. as they relate to Father. Accordingly, we are constrained to hold that such findings, as to Father, were an abuse of discretion, and we reverse the juvenile court's order in that respect.

█ For the reasons discussed in this opinion, we affirm the juvenile court's order as it relates to the termination of Mother's parental rights to both N.H. and M.H., but reverse such order as it relates to Father's parental rights to each of said children. Reversal of the trial court's order terminating Father's parental rights does not mean that physical custody of M.H. and N.H. should forthwith be returned to him. *See In Interest of S.G.*, 779 S.W.2d 45, 56 (Mo.App.1989). The DFS

should be permitted to retain physical custody of the children subject to reasonable visitation rights by Father as prescribed by the juvenile court. However, physical custody should not be returned to Father unless or until the juvenile court determines that the environment in which they will be living creates no reasonably foreseeable risk to the physical or emotional well-being of each of the children.

MONTGOMERY, P.J., and FLANIGAN, J., concur.