**In the Interest of A.K.L. and A.M.L., Plaintiffs–Respondents,**

v.

**D.C., Defendant–Appellant, and L.L., Defendant.**

**No. 20752.**

Missouri Court of Appeals, Southern District, Division One.

April 22, 1997.

Roy E. Williams, Jr., Henry, Henry, Henry, Engelbrecht & Williams, P.C., West Plains, for appellant.

Jo Beth Prewitt, West Plains, for respondent.

BARNEY, Presiding Judge.

Appellant appeals from a judgment terminating her parental rights as the mother of A.K.L. and A.M.L.[1] The action was brought by the juvenile officer of Howell County, Missouri, pursuant to § 211.447.[2] It originated in the Juvenile Division of the Circuit Court of Howell County, Missouri.[3]

The juvenile court terminated Appellant mother's parental rights under the provisions of § 211.447.2(3) in that both juveniles had been under the jurisdiction of the juvenile court for a period of one year and the court found that the juveniles had previously been adjudicated to have required care and treatment because they were without proper care, custody or support, hence neglected. The juvenile court found that the conditions which led to the assumption of jurisdiction still persisted. The juvenile court also found that the Appellant lacked maturity, social and parenting skills and remained unable to provide a stable home for her children. Fur-

---

1. We utilize the abbreviations A.K.L. for the older of the two juveniles and A.M.L. for the younger, D.C. for Appellant mother and L.L. for Defendant father to protect the identities of the juveniles.

2. References to statutes are to RSMo 1994, unless otherwise noted.

3. The Guardian Ad Litem filed a brief on behalf of the Respondent juveniles, A.K.L. and A.M.L. Although the natural father, L.L., is listed on the caption of this appeal, the record is devoid of any petition seeking to terminate his parental rights. Additionally, the judgment of the juvenile court relates only to the termination of the parental rights of the Appellant mother.

ther, the juvenile court found that despite the efforts of the Division of Family Services (DFS), Appellant had failed to comply with the terms of her service plan by failing to make efforts to obtain and maintain full time employment, failing to seek adequate and proper housing, failing to attend counseling, and failing to cooperate with counselors. The juvenile court then determined that continuation of the parent-child relationship would greatly diminish the juveniles' prospects of early integration into a stable and permanent home and that it would be in the children's best interest to terminate Appellant's parental rights.

Appellant mother, born August 31, 1967, raises one point of trial court error. She maintains that there was lack of clear, cogent and convincing evidence in support of the juvenile court's findings and order terminating parental rights to her two minor children, A.K.L., born August 7, 1985, and A.M.L., born October 22, 1986.

 Appellate review of juvenile proceedings is in the nature of appellate review of court-tried civil cases. *In re J.L.C.*, 844 S.W.2d 123, 124 (Mo.App.1992). Therefore, "[i]n reviewing an order of termination, this Court affirms a juvenile court's decision unless there is no substantial evidence to support it, it is against the weight of the evidence, or the court erroneously declared or applied the law." *In re M.N.M.*, 906 S.W.2d 876, 878 (Mo.App.1995). "As this Court reviews the sufficiency of the evidence supporting an order, we consider the evidence and all reasonable inferences in the light most favorable to the order." *Id.* "In addition, we give due regard to the juvenile court's opportunity to judge the credibility of witnesses and resolve fact issues." *Id.* "We will reverse the order only when we firmly believe it is wrong." *Id.* "In any termination of parental rights, the primary concern must be the best interests of the child." *Id.* The existence of even one statutory ground for termination is sufficient if termination is in the child's best interests. *In re*

*M.H.*, 859 S.W.2d 888, 895 (Mo.App.1993); *In re L____ E____ E____*, 839 S.W.2d 348, 352 (Mo.App.1992); *see also* statutory grounds cited in § 211.447. The juvenile officer, as the petitioner, bears the burden of proof in a termination of parental rights proceeding. *M.H.*, 859 S.W.2d at 896. This burden of proof is met if substantial evidence (evidence which, if true, has probative force upon the issues) is clear, cogent and convincing on the issues. *Id.*

As a preliminary matter, Respondents assert in their brief that Appellant can not maintain her appeal because she failed to appeal the ruling of the trial court within the time prescribed by the Juvenile Court Rules. Respondents state that Juvenile Court Rule 119.07 sets out the procedure for the amendment of a judgment in a juvenile court proceeding.[4] The Rule reads in pertinent part as follows:

> a. Upon motion of any party made not later than fifteen days after entry of judgment the court may amend or correct the judgment.
>
> b. The court retains control over judgments during the thirty-day period after entry of judgment and may vacate, reopen, correct or amend its judgment for good cause within that time. . . .

Respondents assert that the trial court entered its judgment on order of termination on September 5, 1995, but that Appellant filed her motion to vacate, reopen, correct, amend and/or modify and alternative motion for new trial on October 2, 1995. Respondents therefore contend that the judgment terminating Appellant's parental rights to the juveniles herein became final for purposes of appeal after thirty days from the date of its entry. Therefore, since Appellant filed her appeal on January 22, 1996, it was untimely filed.

 The timely filing of the notice of appeal is a jurisdictional requirement. *K.W. v. Missouri Div. of Family Servs.*, 694 S.W.2d 915, 917 (Mo.App.1985).

**4.** All references to Juvenile Court Rules are to the 1995 version, unless otherwise noted.

Chapter 211 is a complete act or law within itself and § 211.261, governing appeals from judgments rendered in juvenile court, is construed to require all appeals under the Code to be taken in compliance with that section. *In re J___A___D___*, 905 S.W.2d 101, 103 (Mo.App.1995). Juvenile Court Rule 120.01 is the counterpart to § 211.261 and states in pertinent part that:

b. An appeal shall be allowed to a parent from any final judgment made under the Juvenile Code which adversely affects him.

c. Notice of appeal shall be filed within thirty days after entry of final judgment.

Sections 211.442–490 statutorily set out the law governing termination of parental rights. Section 211.477.5 provides in pertinent part that:

Orders of the court issued pursuant to sections 211.442 to 211.487 shall recite the jurisdictional facts, factual findings on the existence of grounds for termination and that the best interests of the child are served by the disposition stated in the order. The order shall be a final order after thirty days from the date of its entry for purposes of and subject to the rights of appeal.

■ Respondents are correct in asserting that Appellant's post judgment motions to amend or correct the judgment were not timely made because they were filed more than 15 days after the original rendition of the judgment terminating parental rights. Juvenile Court Rule 119.07 a. However, their contention that Appellant was required to file her motion for a new trial within 15 days of the original rendition of the judgment is incorrect. Juvenile Court Rule 119 is silent as to the filing of a motion for a new trial. Juvenile Court Rule 110.04, however, provides that:

If no procedure is specifically provided in these Rules, the juvenile court shall be

governed by the practice and procedure customary in proceedings in equity, and by Rules 41 through 101 to the extent not inconsistent therewith.

*See also K.W.*, 694 S.W.2d at 916.

Rule 73.01(a)(4),[5] Missouri Rules of Civil Procedure provides that:

Not later than thirty days after the entry of judgment, a party may, but need not, file a motion for new trial. The motion may, but need not, be accompanied by a motion to amend the judgment or opinion in accordance with Rule 73.01(a)(5).

Appellant filed her alternative motion for new trial in a timely fashion, within the thirty day period of time, as mandated by Rule 73.01(a)(4), Missouri Rules of Civil Procedure.

Rule 81.05(a), Missouri Rules of Civil Procedure, also provides that for purposes of ascertaining the time within which an appeal may be taken, a judgment becomes final:

at the expiration of thirty days after the entry of such judgment, if no timely motion for a new trial is filed. . . . In the event a motion for a new trial is timely filed, the judgment becomes final at the expiration of ninety days after the filing of such motion or, if such motion is passed on at an earlier date, then at the later of thirty days after entry of judgment and the date of disposition of said motion.

Rule 81.04(a), Missouri Rules of Civil Procedure, also provides that:

No such appeal shall be effective unless the notice of appeal shall be filed not later than ten days after the judgment or order appealed from becomes final.

*See Taylor v. United Parcel Serv., Inc.*, 854 S.W.2d 390, 392 (Mo. banc 1993); see also Bank of Kirksville v. First Bank *Centre*, 924 S.W.2d 884, 885 (Mo.App.1996); Dudley v. *Dudley*, 637 S.W.2d 416, 416–17 (Mo.App. 1982).

---

5. All references to Missouri Rules of Civil Procedure are to the 1995 version, unless otherwise specified.

The trial court entered its order on after trial motion on December 19, 1995, denying, *inter alia*, Appellant's motion for new trial. Therefore, after such entry of the trial court's order, Appellant had ten days, under Rule 81.04(a), Missouri Rules of Civil Procedure, to file her notice of appeal.

Although the record shows that a formal notice of appeal was filed by Appellant on January 22, 1996, the record also reflects that on December 22, 1995, within the ten day period mandated by Rule 81.04, Missouri Rules of Civil Procedure, Appellant's counsel conveyed a letter to the clerk of the circuit court wherein he requested that Appellant's notice of appeal be filed. The docket entry does not reflect the filing of the notice of appeal and we can reasonably conclude that this was not done because of the failure to submit the $50.00 docket fee, as required by Rule 81.04(c), Missouri Rules of Civil Procedure. Additionally, on December 22, 1995, Appellant's counsel submitted, and the clerk of the circuit court filed, Appellant's motion for order to proceed in forma pauperis, request for preparation of transcript on appeal, and request for preparation of legal file. This was then followed on December 27, 1995, by Appellant's affidavit in support of her in forma pauperis motion. The trial court then requested further income information prior to authorizing Appellant to file her notice of appeal and proceed in forma pauperis, which authorization was granted on January 22, 1996, the same date that the clerk of the circuit court actually filed Appellant's formal notice of appeal.

■ We hold, therefore, that since Appellant had filed her notice of appeal and requested to proceed in forma pauperis within the ten day period following the trial court's order denying Appellant's motion for a new trial, Appellant had done all she could do to comply with the provisions of Rule 81.04, Missouri Rules of Civil Procedure. We hold that under these circumstances the order of

the trial court dated January 22, 1996, granting Appellant leave to appeal in forma pauperis and the filing on that day of Appellant's notice of appeal, related back to the date the notice of appeal was originally tendered for filing, December 22, 1995. Jurisdiction is, therefore, in this Court. *Jones v. State,* 506 S.W.2d 387, 388–89 (Mo.1974).[6]

Returning to Appellant's sole contention on appeal, the evidence shows that on May 22, 1992, the sibling sisters herein, then ages six and five, were found by the police wandering across busy streets several blocks from their home. On that same date, Appellant was arrested and incarcerated on an unrelated criminal charge. The minors were placed in foster care.

The juvenile officer filed a petition alleging that the minors were in need of care and treatment under the provisions of § 211.031.1(1)(b), in that: (a) Appellant had difficulty controlling her children and they had left home in the past; (b) the children ignored her directives; (c) on the previous March 9, 1992, Appellant had requested the intervention of DFS because Appellant could not control the juveniles' behavior and was concerned about their safety; further, Appellant had asked Ms. Janella Madden if she would take care of her two children, but Ms. Madden had refused; (d) in March of 1992, Appellant had placed the juveniles in the home of a friend, Ms. Tina Walker, and intended to leave the children there for a "long period of time." However, after two weeks Appellant retrieved the children, citing concern for the children's safety since Appellant felt that the juveniles were at risk of sexual abuse if left in the home; (e) the natural father is not an appropriate caretaker in that he did not receive visitation rights in the divorce decree, was physically abusive toward Appellant during their marriage and had failed to properly supervise the children on May 22, 1992, when left in his care; (f) theretofore the Division of Family Services had provided supportive services to the fami-

---

6. We note that Appellant has made a motion under Rule 81.07, Missouri Rules of Civil Procedure, seeking a special order permitting her to make a late filing of a notice of appeal in her case. In view of our ruling, this motion is made moot.

ly. Appellant then moved to Illinois, but returned in May 1989 and the case was re-opened. Services were provided including counseling and day care for the juveniles. In April 1991, services were again offered due to lack of supervision of the children by Appellant. However, Appellant declined the offer of counseling.

On September 10, 1992, Appellant appeared in juvenile court and admitted that the allegations of the petition were true, save for her being incarcerated. She also informed the juvenile court that she was homeless. The juvenile court assumed formal custody of the juveniles and placed them with DFS.

In subsequent court appearances on March 11, 1993, September 10, 1993, December 23, 1993 and April 14, 1994, Appellant continued to be in agreement with the continued foster care placement of her children. It was during this period of time that the record shows that Appellant: (1) was briefly employed at Rojo Poultry; Marathon Electric, an autobody repair shop; a nursing home; a housekeeping job; and a paper delivery route; otherwise she was unemployed; (2) changed residences at least 11 times, inclusive of the homes of her mother and a sister; and (3) resided with at least three different men.

Appellant frequently visited with her daughters during this time. Additionally, she underwent a psychological evaluation on June 28, 1993, and began in-home counseling during the same month. This counseling continued until October 28, 1993, at which time Appellant terminated her counseling sessions. From that time forward, she commenced a pattern of refusing services and therapy and resisted efforts to teach her proper parenting skills. She refused to sign service agreements, refused counseling and refused to undergo a psychological evaluation until April 10, 1995, and then it was deemed "invalid" due to her noncooperation and withholding of information. Appellant also continued to change jobs frequently.

Dr. Clara N. J. Applegate, a board certified neurologist, testified that the oldest ju-venile, A.K.L., was bright but showed a history of eating crayons, staples, buttons and similar items when she became depressed. Dr. Applegate related that A.K.L. told her that she had been beaten by one of her mother's boyfriends until she was bleeding on her legs and that her life had been very disorganized when she lived with her mother. Dr. Applegate testified that she had talked with Appellant about the beating incident and that Appellant had stated to Dr. Applegate that "that was the last time that that fellow ever beat the kids." However, Dr. Applegate testified that Appellant said that the boyfriend continued to live in the house, even after having beaten her daughter.

Dr. Applegate also related that A.K.L. showed a history of being disruptive at school, particularly following visits with her mother. Dr. Applegate related that in meetings she had with A.K.L. that closely coincided with A.K.L.'s visits with her mother, A.K.L. became tremendously upset by these visits. In one instance, A.K.L. related to Dr. Applegate that on July 10, 1995, Appellant had given A.M.L. a "toy" gun and told A.K.L. to shoot her dog and to generally be disruptive with her foster parents. A.K.L. told Dr. Applegate that the gun was strong enough to "have put a window out."

Dr. Applegate also related that on April 5, 1995, she had visited with A.K.L. on an emergency basis. At that time A.K.L. was exhibiting behavior problems at her foster home after a visit with Appellant at her home. A.K.L. stated that a man named Jerry had been affectionate with her and that Appellant had had her change from jeans into a skirt against her will and "forced [her] to sit in Jerry's lap and then ride piggyback on his back."

Dr. Applegate then testified that in her opinion A.K.L. needed a very organized home environment. She recommended continued "extremely organized visits with her therapist and consistent behavior on the part of . . . her parenting individuals. . . ." Dr. Applegate then concluded by stating that A.K.L. was "at the end of her rope. And I

fear that, if the visits [with her mother] continue, she's going to require further hospitalization."

Cathy Minnich, a special education teacher at Junction Hill, testified that A.K.L. was her student during the 1994–95 school year. She stated that the first day she was in school, she drank paint water in art class and thereafter for a period of time, there were ongoing problems of her putting things in her mouth and her being physically aggressive toward other children and [in the form of biting, choking and kicking of other students] was generally disruptive. The problems continued but lessened to a degree over the course of the school year. Ms. Minnich then stated that although she was not aware when A.K.L. visited her mother, when a major problem arose "I would find out that there had been a visit." She stated that after a visit with her mother "we would have just serious acting out." Ms. Minnich acknowledged that A.K.L. would come to school upset with her foster parents as well.

Kathleen Bell, a DFS caseworker involved with Appellant and her daughters, testified that she had been on the case since June of 1994. Ms. Bell testified that Appellant had not regularly attended her weekly counseling/therapy sessions and worked only sporadically with a parent aide. Further that "in almost every way" Appellant had failed to comply with the service agreements. In response to the question as to whether Appellant could provide a safe and stable environment for her children, Ms. Bell stated "no." Ms. Bell further testified that there were no further services the DFS could offer Appellant and her daughters which would further reunification. She also testified that Appellant's parental rights as to the juveniles should be terminated.

Kathleen Wolf, a licensed clinical social worker and outpatient psychotherapist at Ozarks Medical Center testified that she had begun treating A.K.L. on July 29, 1994, and treated her almost a year. She had seen A.K.L. on a weekly basis. She acknowledged that A.K.L. suffered from attention-deficit disorder with hyperactivity, depression and post-traumatic stress disorder. Additionally, she had suicidal tendencies. Ms. Wolf also stated that A.K.L. was prone to severe mood swings, temper tantrums, self-injurious behavior, general acting out and had difficulties controlling herself. Ms. Wolf supported a recommendation that the siblings not live in the same foster home because neither juvenile could control herself in each other's company. "I've seen the two of them with [A.M.L.'s] therapist in therapy. And they still have a real hard time controlling themselves." Ms. Wolf said that they were each "very defiant." She further stated:

> They just move around a lot. [A.K.L.] historically claimed that she was like A.M.L.'s mother and that she mothers [A.M.L.] And so, when we put the two girls together, it was, you know, to work out their differences and—and try to deal with this belief that she had. And, in fact, she would become extremely bossy and controlling of [A.M.L.] And ... then, they would just kind of soar into the heavens together. They would just become out of control.

Although it was Ms. Wolf's opinion that she saw no correlation between A.K.L.'s behavior and visits with her mother, Ms. Wolf concluded that based on A.K.L's behavior and the remarks she made, "[m]y opinion is that it is not in [A.K.L.'s] best interest to continue those visits." Ms. Wolf then testified that consistently "[w]hen she ... discusses visits with—that she's had with her mom, she becomes pretty agitated and ... at times ... has just said, 'I can't talk about this anymore.' ... She becomes visibly shaky." Ms. Wolf also stated that "I saw [A.K.L.] eight times.... [S]he was consistent in that she wanted to live in a foster home, did not want to live with her mother or see her mom."

Sam Lucas was Appellant and the juveniles' first case worker. He oversaw their case for about two years, beginning from May 22, 1992. Mr. Lucas testified that although Appellant was consistent in her counseling sessions at Ozark Area Care with her counselor, David Sawyer, this was not the

case with her second counselor, Russ Lacewell. Mr. Lacewell would make in-home visits and was working with Appellant on her parenting skills. However, about November of 1993 when he attempted to make home visits with Appellant, she began absenting herself from her home. On one occasion, he observed her in an automobile going around the corner as he was knocking on the door.

Mr. Lucas also testified as to Appellant's nomadic movement of her home, as well as to her sporadic work activities during this two-year period of time. He also related that, contrary to the service agreements, Appellant participated in only two employment training sessions with Ozark Action.

Mr. Lucas also testified that he supervised Appellant's visitation with her daughters. It was his opinion that she was unable to control her children. He stated that Appellant had problems relating to the children and that they would become "very active during the visits." He stated that they "would generally—She'd ask them to do something, and they would do the opposite...." Mr. Lucas stated that:

> [w]hen the two girls were together, they'd tend to spin off each other in terms of behavior. One would do something. The one also would do it. There was a bit of her sibling rivalry going on and that sort of thing. But it seemed like mostly [A.K.L.] was the leader there, and she kind of was like a parentified (sic) child in that she kind of took over a lot of the—like, the motherly relationship to her younger sister.

Mr. Lucas also stated that his assessment "would be that it would still be very, very difficult for her to care for both children, to be able on a consistent basis." Mr. Lucas concluded by stating that "my major concern is her [Appellant's] ability to parent and provide a safe, stable environment for [her] children."

The Guardian Ad Litem recommended that Appellant's parental rights to the juveniles be terminated. She stated that "I'm the only one sitting here who's been involved ever since the case was filed, except for the Court." She then stated that "there have been 11 counselors and psychiatrists ... or residential placements, including Burrell Mental Health Center and Lakeland and Bramblewood. So I don't know how anyone can even attempt to argue that there hasn't been an appropriate attempt on the part of the DFS to reunite these girls with their family." The Guardian Ad Litem further stated to the juvenile court that "[t]his is one case I have no qualms whatsoever about saying I fully support termination."

■ Appellant did not testify during the course of the termination of parental rights hearings, nor was she called to testify by any of the parties. She argues in her briefs that the system failed her and that DFS could have done more to effect reunification by providing other forms of assistance. There is no statutory right, however, to a certain level or standard of DFS treatment and services in a termination proceeding. *In re N.D.*, 857 S.W.2d 835, 840 (Mo.App.1993). The failure of DFS to provide treatment or services to a parent is not a valid defense for use by the parent in a termination proceeding. *Id.*[7]

■ We find substantial evidence in support of the juvenile court's judgment terminating Appellant's parental rights to the juveniles herein. *See M.N.M.*, 906 S.W.2d at 879. The evidence in this case, inclusive of submitted reports of caseworkers and professional experts, shows that A.K.L. suffered from mental and psychological problems manifested by a severe behavior disorder. Additionally, A.M.L., although not as psychologically impaired as her sibling, likewise exhibited negative behavior traits and was diffi-

---

7. After custody was taken of the juveniles, Appellant and the juveniles were offered the services of the following counselors or therapists: David Sawyer; Burrell Center; Michelle Barnes and John Stefanowicz, Ph.D.; Russell Lacewell, ACSW, LCSW; Joyce R. Tinsley, Ph.D.; Bramblewood Group Home; Anna M. Beatty, Psy. D.; Harold McGuffey, M.D. and Lakeland Regional Hospital; Clara N.J. Applegate, M.D.; Beth Nevergall, ACSW, LCSW; Kathleen Wolf, MS, ATR, LCSW; Patricia Carson ACSW, LCSW; Kenneth R. McDonald, PH.D.; Shanaaz Dana.

cult to control. In view of the foregoing, in order to function as an effective and loving parent, it was imperative that Appellant establish a stable and structured home prior to the court's placement of the juveniles back in Appellant's care. The evidence shows that Appellant failed in this endeavor. Additionally, at the commencement of the juvenile court's assumption of jurisdiction over the juveniles, the evidence showed that Appellant lacked the necessary social and parenting skills necessary to properly rear A.K.L., a mentally and psychologically impaired juvenile, as well as A.M.L., a difficult child to control. The evidence further shows that Appellant has never acknowledged the severity of her children's long-standing behavioral problems. She also over-estimated her ability to parent these children effectively. Ultimately she refused to cooperate with the DFS and her assigned counselors and therapists. Additionally, it is clear from the evidence that no close emotional ties exist among the juveniles and Appellant. Consequently, the evidence supports the court's conclusion that Appellant continues to lack appropriate social and parenting skills required to effectively function as a parent to these particularly difficult juveniles.

The judgment is affirmed.

GARRISON and PREWITT, JJ., concur.