

# In the Missouri Court of Appeals
## Western District

IN THE INTEREST OF: K.N.D., D.D.D. )
and G.N.D.; )
JUVENILE OFFICER; ) **WD84708**
DEPARTMENT OF SOCIAL SERVICES, ) **CONSOLIDATED WITH**
CHILDREN'S DIVISION, ) **WD84709, WD84712,**
                  Respondent, ) **WD84736, WD84737, WD84738**
v. )
                    )
C.K.D., ) **FILED: April 19, 2022**
             Appellant, )
D.L.D., )
             Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
#### THE HONORABLE JON E. BEETEM, JUDGE

### BEFORE DIVISION ONE: LISA WHITE HARDWICK, PRESIDING JUDGE,
### ALOK AHUJA, AND MARK D. PFEIFFER, JUDGES

C.K.D. ("Mother") and D.L.D. ("Father") appeal the termination of their

parental rights to three of their children, K.N.D., D.D.D., and G.N.D.  Father

challenges the sufficiency of the evidence to support one of the three grounds on

which the court terminated his parental rights and argues the court erred in

overruling his hearsay objection to testimony about the children's out-of-court

statements.  Mother challenges the sufficiency of the evidence to support the

three grounds on which the court terminated her parental rights and argues the

court's finding that termination was in the children's best interest was against the weight of the evidence. Both parents contend the circuit court erred in denying their motion for a continuance or to keep the record open until after the resolution of their criminal trials on charges of child abuse and endangering the welfare of a child. For reasons explained herein, we affirm the judgments.

## FACTUAL AND PROCEDURAL HISTORY

In the fall of 2018, Mother and Father, who were married in August 2012, were living in Jefferson City with their combined six children. Three children were theirs: K.N.D., a girl born on November 15, 2015, D.D.D., a boy born on September 3, 2012, and G.N.D., a boy born on July 20, 2011. Two children were from Father's prior relationship: N.G-A.D., a girl born on December 29, 2009, and N.L.D., a boy born on May 20, 2008. One child, A.I.R., a girl born on April 9, 2010, was from Mother's prior relationship.

In November 2018, the court adjudicated all of the children in need of the care and protection of the court for abuse and neglect based on the following findings: In the early morning hours of October 10, 2018, N.G-A.D. and A.I.R. were found walking along Highway 54 with wet clothing, wet hair, and no adult supervision. The girls reported that they had been locked in a room for several days, were not allowed to talk, and had to urinate on the wood floor because they were locked in their bedroom. Children's Division observed that the girls' bedroom was bare and was without blankets, beds, pillows, or other furnishings except a dresser. The girls' hair was misshapen, and they appeared to have

2

recently shaved heads. Both girls said that Father had cut their hair as punishment. N.G-A.D. and A.I.R. reported that Father threw N.G-A.D. around the room, choked her, smacked her face, and caused her to fall to the ground. A.I.R. reported that Father spanked her with a belt until she bled. Children's Division and law enforcement observed a large bruise on A.I.R.'s outer right thigh, which A.I.R. said was the result of Father's spanking her with a belt. A.I.R. was seen by a pediatrician, who confirmed her injury was consistent with child physical abuse. None of the children attended school, had a pediatrician, engaged in activities, or socialized outside of the home. The children were permitted to change into clean underwear and shower only on Sundays. The children received limited peanut butter crackers and peanut butter sandwiches for breakfast and dinner and were not fed lunch. Children's Division observed minimal food in the home. Mother failed to protect and/or provide care to her children, and both Mother and Father were in the Cole County Jail awaiting trial for multiple counts of felony child abuse or neglect and felony first-degree endangering the welfare of a child.

The court ordered all of the children removed from the home and placed in foster care. Due to the level of abuse, the circuit court relieved the Children's Division of its statutory obligation to make reasonable efforts toward reunification pursuant to Section 211.183.7.[1] Additionally, a no-contact order was put in place

---

[1] All statutory references are to the Revised Statutes of Missouri 2016, as updated by the 2018 Cumulative Supplement.

3

as a condition of bond in Mother's and Father's criminal cases that prohibited them from having visitation with the children.

After the children were removed from Mother and Father's care, Brenda Porter, a forensic interviewer at Rainbow House, conducted separate recorded interviews with all of the children except K.N.D., who was too young. Kathleen Miller, their Children's Division social worker, also spoke with the children. All of the children except K.N.D. underwent separate weekly counseling sessions with Kym Armontrout for approximately a year following their removal from the home before they began going to different therapists, from whom they continued to receive treatment through the time of trial.[2]

In May and June 2019, the Juvenile Officer of Cole County ("Juvenile Officer") filed petitions to terminate Mother's and Father's parental rights to K.N.D., D.D.D., and G.N.D.; Father's parental rights to N.G-A.D. and N.L.D.;[3] and Mother's parental rights to A.I.R. [4] Each of the six petitions asserted, as one of the grounds for termination, that the children had been abused or neglected under Section 211.447.5(2).

---

[2] K.N.D. started attending therapy with Armontrout in February 2019 and was later released from therapy. Due to her age, she did not undergo a psychological evaluation and has adjusted well to her foster home environment.

[3] N.G-A.D. and N.L.D.'s mother, A.W., was incarcerated in Texas and released in October 2020. The Juvenile Officer did not seek to terminate her parental rights.

[4] A.I.R.'s father, J.R., lives in Texas. The Juvenile Officer initially sought to terminate his parental rights but later withdrew that request.

The court heard all six petitions in one bench trial. Evidence at trial included the testimony of the highway patrol officer who picked up N.G-A.D. and A.I.R. after they ran away in October 2018; the testimony of Dr. Nancy Howe, a pediatrician who examined the children immediately after they were removed from the home; Armontrout's testimony detailing her observations and opinions of the mental and emotional health of the children; Miller's testimony and reports regarding her investigation and conversations with the children, Mother, and Father; and Porter's testimony describing her interviews with the five eldest children. The court also admitted the recordings of Porter's interviews with the children.

Following the trial, the court entered judgments terminating Mother's and Father's parental rights to K.N.D., D.D.D., and G.N.D.; Father's parental rights to N.G-A.D. and N.L.D.; and Mother's parental rights to A.I.R. In each of the six judgments, the court found that termination was appropriate on the bases of abuse and neglect under Section 211.447.5(2), failure to rectify under Section 211.447.5(3), and parental unfitness under Section 211.447.5(5)(a). The court further determined that termination of Mother's and Father's parental rights was in each child's best interest and supported this conclusion with specific findings on the factors listed in Section 211.447.7.

Mother and Father appeal the termination judgments. This case addresses Mother's and Father's appeals of the termination of their parental rights to K.N.D., D.D.D., and G.N.D. We affirmed the termination of Father's parental rights to N.G-

5

A.D. and N.L.D. in *N.L.D. v. D.L.D.*, No. WD84710 (Mo. App. April 19, 2022), and the termination of Mother's parental rights to A.I.R. in *A.I.R. v. C.K.D.*, No. WD84735 (Mo. App. April 19, 2022).

## STANDARD OF REVIEW

"Termination of parental rights is an exercise of awesome power, and therefore we review such cases closely." *Interest of D.L.S.*, 606 S.W.3d 217, 222 (Mo. App. 2020) (citation omitted). Termination is appropriate when there is clear, cogent, and convincing evidence to support a statutory ground for termination and when a preponderance of the evidence establishes that termination of parental rights is in the child's best interest. *Id.* "Clear, cogent, and convincing evidence is evidence that 'instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true.'" *Mo. Dep't. of Soc. Servs, Children's Div. v. B.T.W.*, 422 S.W.3d 381, 391 (Mo. App. 2013) (citation omitted).

Whether there is clear, cogent, and convincing evidence to support a statutory ground for terminating parental rights is reviewed under the standard of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014). Therefore, we will affirm the termination judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32. In our review, we defer to the circuit court's factual findings and consider the evidence and reasonable inferences therefrom in the light most favorable to the

6

judgment. *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004). We recognize that the circuit court was "free to disbelieve any, all, or none of the evidence, and it is not the reviewing appellate court's role to re-evaluate the evidence through its own perspective." *In Interest of J.P.B.*, 509 S.W.3d 84, 90 (Mo. banc 2017) (citation omitted).

## ANALYSIS

### *Sufficiency of Evidence to Support Termination*

In Father's Points I, II, and III and Mother's Point I, they contest the sufficiency of the evidence to support the court's terminating their parental rights on the ground of abuse or neglect pursuant to Section 211.447.5(2).[5] Looking first at Father's points, with regard to D.D.D. (Point I), K.N.D. (Point II), and G.N.D. (Point III), he makes the same claims: there was no evidence of abuse specific to

---

[5] Father does not dispute the court's determination that termination was also appropriate on the grounds of failure to rectify, Section 211.447.5(3), and parental unfitness, Section 211.447.5(5). Although these grounds were not asserted in the termination petitions for K.N.D., D.D.D., and G.N.D., Father did not preserve a challenge to the propriety of the court's terminating on grounds not alleged in the petition by raising it as an issue in the circuit court, nor does he assert it as error on appeal. *See In Interest of I.K.H.,* 566 S.W.3d 629, 632 (Mo. App. 2018). Because Father does not make any challenge to the court's terminating on the grounds of failure to rectify and parental unfitness, even if we were to find that his challenge to the court's findings of abuse or neglect was meritorious, his appeal of the termination would necessarily fail because "one ground alone is sufficient to terminate parental rights if it is supported by clear and convincing evidence." *In Interest of A.C.G.*, 499 S.W.3d 340, 347 (Mo. App. 2016) (citation omitted). Nevertheless, "because the termination of parental rights is an exercise of awesome power and should not be done lightly," we will exercise our discretion to review the record and determine whether the Juvenile Officer established that termination was appropriate on the basis of abuse or neglect. *Id.* (internal quotation marks and citation omitted).

7

that child, and the evidence about the children as a group was not clear and, at best, was only that they were unschooled and fed only two meals a day.

Section 211.447.5(2) provides that the court may terminate parental rights if it is established that the child has been abused or neglected. In deciding whether to terminate on this ground, the court is to consider and make findings on four factors:

> (a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
>
> (b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
>
> (c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
>
> (d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.

§ 211.447.5(2)(a)-(d). "These four factors are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves." *D.L.S.*, 606 S.W.3d at 226 (citation omitted).

However, proof of any one of these factors is sufficient to support termination under Section 211.447.5(2). *Id.*

Here, the circuit court found no evidence of factors (a) or (b) and extensive evidence of factors (c) and (d). With regard to factor (c), the court determined that there had been severe and recurrent acts of physical and emotional abuse toward the child and the child's siblings by the parents and that such "acts were committed with the knowledge and complicit [sic] consent of [Mother] and thus by both parents, under circumstances that indicated that the parent knew or should have known that such acts were being committed toward the child and the other children in the household." The court then listed 19 findings to support this factor:

> 1.) The parents locked [N.G-A.D.] and [A.I.R.] in their bedroom for long periods of time without beds, blankets, pillows, additional clothing, or other furnishings. They only allowed these two children to leave their bedroom twice a day to use the restroom, once a week to shower and [they were] sometimes allowed out to eat. They placed alarms on the bedroom door and bedroom window in order to prevent them from leaving their bedroom.
>
> 2.) The parents limited the children's access to appropriate food, by only allowing the children to eat breakfast and dinner and limiting their meals to half a peanut butter sandwich.
>
> 3.) On October 10, 2018, [N.G-A.D.] and [A.I.R.] ran away from home by escaping through the window of their bedroom and were found on a nearby highway by a passerby. The girls stated they were running away to Texas. The girls were without appropriate clothing and were not wearing shoes and their heads had been recently shaved.

9

4.)  Father spanked the children with belts and a wooden spoon or spatula on their legs, arms and back, and these spankings left marks on the[ir] legs and arms.

5.)  Father placed the oldest child, [N.L.D.], age 10, in charge of the girls and ma[de] him monitor the girls when they are allowed out of their bedroom to go to the bathroom and required [N.L.D.] and [G.N.D.] to spank or punish the girls.

6.)  [D.D.D. and G.N.D. were] examined by Dr. Nancy Howe on October 12, 2018[,] wherein she found and observed physical evidence of abuse on the children[,] namely, bruising, consistent with the child being struck with a belt.  Photographs were admitted into evidence, Petitioner's Exhibit 10.

7.)  Father shoved [N.G-A.D.]'s face/head into the wall causing her head to bleed.  [A.I.R.] confirmed the incident where [Father] caused injury to [N.G-A.D.]'s head, leaving a knot, and that she observed [N.G-A.D.] to have a busted chin, tears on her skin and a bloody nose.  [N.G-A.D.] was taken to the hospital for the head injury but was told by [Father] to say that she tripped over a toy and fell down the stairs.

8.)  As a form of punishment, Father made [N.G-A.D.] and [A.I.R.] stand on one leg with their head against the wall.  The boys were made to monitor [N.G-A.D.] and [A.I.R.]'s compliance and tell on them if either girl put a foot down.

9.)  [Father] threw [A.I.R.] and [N.G-A.D.] on the carpet, shaved their heads as punishment, and slapped them until they fell down. [Father] choked [N.G-A.D.], picked her up and threw her across the room.

10.)  [Father] slapped [A.I.R.] across the mouth with a belt, causing her mouth [to] bleed, choked her with his hands, [and] picked her up by her arm and threw her to the other side of the room. [Father] would call [A.I.R.] and [N.G-A.D.] names while physically abusing them, such as "bitch", "whore", and saying "fuck you girls".

10

11.)  [Father] bruised [N.G-A.D.]'s arm causing her pain but her parents didn't take her to the doctor.  A subsequent medical exam confirmed that [N.G-A.D.]'s arm did sustain a break at some point in the past.

12.)  [Father] hit [N.G-A.D.] with a box[,] causing her to hit her chin against the wall[,] making it bleed.

13.)  [A.I.R.] and [N.G-A.D.] were only allowed to wear a T-shirt and were not allowed to wear pants or socks, and they were made to wear these T-shirts all the time without changing them.  They could only change the shirt if [Father] wanted to wash them.

14.)  [N.L.D.] would get the girls from their bedroom for dinner and breakfast but wouldn't speak to them because he wasn't allowed to talk to them.

15.)  [A.I.R.] and [N.G-A.D.] were only given peanut butter and crackers or half of a peanut butter sandwich for breakfast and dinner[,] but the boys would get to eat spaghetti and other stuff in front of the girls[.]  . . . [T]he girls weren't allowed to eat the other food because they were being punished for talking.

16.)  [Father] did not allow Mother to let the girls out of their bedroom.

17.)  [Father] made [N.L.D.] watch the girls and take them to the bathroom because Father believed the girls would steal food and toys.  N.L.D. stated that the girls would come out of the room only if either [N.L.D.] or [Father] were present to watch the girls.

18.)  [G.N.D.] and the other children got spankings from [Father] with a belt.  The spankings left marks, which [Father] ma[de] [G.N.D.] show him the marks on his body to make sure Father was spanking hard enough.

11

19.) [G.N.D.] would steal potatoes to eat and would get spankings if he was caught stealing food.[6]

Father first argues that the court's factual findings that refer to "the children" are too "vague" and "generalized" to support termination because they do not specify which children. Any complaints Father had about the clarity or sufficiency of the court's findings in the judgments had to be raised in a motion to amend. *In Interest of K.S.*, 561 S.W.3d 399, 407 n.3 (Mo. App. 2018). "In all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raise in a motion to amend the judgment in order to be preserved for appellate review." *Id.* (quoting Rule 78.07(c)). Because Father did not file a motion to amend the judgments, his allegation of error concerning the clarity and sufficiency of the court's findings is waived and will not be addressed. *See id.*

Father next contends that the court erred in terminating on the basis of abuse because there was no evidence that he specifically abused K.N.D., D.D.D., and G.N.D. Father's argument ignores the plain language of the statute, which does not require that the abuse be inflicted specifically on the child who is the subject of the petition. Section 211.447.5(2)(c) states that evidence of physical and emotional abuse "toward the child *or any child in the family* by the parent" supports termination on the ground of abuse. (Emphasis added.) Viewing the

---

[6] The wording of these findings varies slightly between the three judgments. However, the findings are substantively the same.

record in the light most favorable to the judgment, there was substantial evidence that Father inflicted severe and recurrent acts of physical and emotional abuse on two children in the family, N.G-A.D. and A.I.R., including: locking them in their rooms for long periods without beds, blankets, or pillows; prohibiting them from talking and punishing them for talking; limiting their access to the bathroom to only twice a day; denying them adequate food and clean clothing; shaving their heads as punishment; spanking them with belts, wooden and metal spoons, and spatulas on their legs, arms, and backs; shoving N.G-A.D.'s face into a wall; slapping A.I.R. with a belt and choking her; forcing both girls to stand on one foot while facing the wall for long periods; hitting N.G-A.D. in the face with a box; calling N.G-A.D. a "crazy bitch" and a "whore"; and telling N.G-A.D. and A.I.R. "fuck you girls."

Furthermore, while there may have been *less* evidence of abuse inflicted on K.N.D., D.D.D., and G.N.D. than on N.G-A.D. and A.I.R., Father's contention that there was *no* evidence of any physical or emotional abuse directed specifically at K.N.D., D.D.D., or G.N.D. is not accurate. There was evidence that Father "smacked" K.N.D., who was only two years old at the time of removal, on her arm as punishment, and that he had taught her to curse and to call G.N.D. a "faggot." Father engaged in emotional abuse of D.D.D. and G.N.D. by making D.D.D., who was six years old at the time of removal, and G.N.D., who was then seven years old, witness and participate in his abusive behavior toward N.G-A.D. and A.I.R. and by making D.D.D. and G.N.D. enforce the abusive restrictions that Father

13

placed on the girls. Additionally, both D.D.D. and G.N.D. reported that Father put knives on a remote control car and chased the children around with the car, and there was evidence that Father spanked D.D.D. with a belt and a metal spoon. According to A.I.R., Father did not hit D.D.D. as hard because "[Father] only wished he could have [D.D.D.] and [K.N.D.] and that's it." After he was removed from the home, D.D.D. struggled with trust issues and was diagnosed with Adjustment Disorder with Mixed Emotions of Disturbance and Conduct.

Furthermore, contrary to Father's claim, there was evidence that he inflicted severe and recurrent physical and emotional abuse specifically on G.N.D. Like N.G-A.D. and A.I.R., G.N.D. reported having to stand on one foot while looking at the wall for long periods. G.N.D. reported that Father spanked him on his back, arm, and legs with a belt and that, afterwards, Father wanted G.N.D. to show him the belt marks because "he's trying to see if he got us good or not." A.I.R. reported that Father said that G.N.D. was a "retard," and there was evidence that Father instructed G.N.D. numerous times to "hurt the girls," *i.e.*, N.G-A.D. and A.I.R., by fighting with them or hitting them. After he was removed from the home, G.N.D. struggled emotionally, was "very mistrusting," hurt a dog multiple times, and was diagnosed with Major Depressive Disorder, Oppositional Defiant Disorder, PTSD, neglect victim in childhood, and physical abuse victim in childhood. G.N.D. asked about going back home to Mother and Father only because he believed that "he's bad and so he deserves to be there for punishment because he's bad." As of the time of trial, G.N.D. was in a residential treatment

14

facility, on medication, and receiving "pretty intense treatment to be able to integrate into a home setting."

This evidence, combined with the substantial evidence of severe and recurrent physical and emotional abuse that Father inflicted on N.G-A.D. and A.I.R., was sufficient to support terminating Father's parental rights to K.N.D., D.D.D. and G.N.D. on the basis of abuse or neglect under Section 211.447.5(2). Father's Points I, II, and III are denied. Having found that the evidence regarding factor (c) was alone sufficient to support termination under Section 211.447.5(2), we need not address Father's claim in Point VII that the evidence supporting factor (d) was insufficient to support termination under this section. *See D.L.S.*, 606 S.W.3d at 226. *See also In Interest of B.D.M.*, 587 S.W.3d 367, 378 (Mo. App. 2019). Father's Point VII is denied.

In Mother's Point I, she argues that the evidence was insufficient to support terminating her parental rights on the basis of abuse because she was not the "aggressor" in any abusive conduct towards the children. She contends that most of the 19 instances of abuse pertain exclusively to Father, and those that apply to "the parents" lack sufficient evidence to support any finding that she took part in, knew, or should have known about any ongoing abuse or neglect in the home.

Section 211.447.5(2)(c) does not require that Mother be the "aggressor." Rather, so long as Mother "knew or should have known that [abusive acts] were being committed [by another]," the termination of her parental rights was

15

appropriate. Ample evidence in the record demonstrates Mother's direct knowledge of multiple ongoing instances of abuse. According to A.I.R., Mother and Father agreed that A.I.R. and N.G-A.D. could only wear t-shirts and underwear at all times. Mother was present in the room when Father slapped N.G-A.D. to the ground and hurt her arm as punishment for talking. When N.G-A.D. told Mother her arm was still hurting several days later and that she wanted to go to the doctor, Mother told her that it was just a "bruised bone," that she was fine, and not to use her arm. After N.G-A.D. was removed from the home, a medical examination confirmed that she had suffered a past break in that arm. On the occasion when Father hit N.G-A.D. and caused her face to hit the wall, N.G-A.D. complained to Mother about the knot on her head. Mother told her she was fine. Eventually, Father took N.G-A.D. to the hospital for the head injury and made her lie about how it happened. N.G-A.D. and A.I.R. recalled multiple instances where Father's physical abuse caused their faces to bleed, which would have been visible to Mother. G.N.D. recalled that, while Father was forcing him to stand on one foot and face the wall for prolonged periods, Mother was in the room looking at her tablet. Additionally, according to G.N.D., when Father hit the children with his belt, all of them screamed and cried loudly, and Mother was sitting on the couch and could hear them.

Notwithstanding evidence demonstrating her direct knowledge of the abuse, Mother relies on *In Interest of M.H.*, 859 S.W.2d 888, 895 (Mo. App. 1993), a case in which the Southern District of this court reversed the termination of a

16

father's parental rights because the record lacked evidence that he knew or should have known of abuse by the victim's mother. In *M.H.*, the victim's mother abused the child on two isolated occasions while the victim's father was not present in the home. *Id.* at 890-92. Here, however, the record indicates that Father's abusive conduct occurred with near constant frequency over a substantial period of time. Even if Father exclusively committed each abusive act evidenced in the record, given the severity, frequency, and the extensive period of time over which the abuse occurred, the circuit court could reasonably infer that Mother knew or should have known of the abuse. This inference is further reinforced by evidence that Mother was not employed and did not have a driver's license; therefore, she was in the home for extended periods and available to witness the abuse first hand.

Nevertheless, Mother argues that her parental rights should not be terminated because "she would ask [Father] to stop sometimes" and she would "tuck the girls in" every night. In the light most favorable to the judgment, evidence that Mother "sometimes" asked Father to stop directly evinces her knowledge of abuse and does not refute other evidence that Mother was party to the abusive conduct to which she did not openly object. Moreover, although Mother argues that her act of "tucking in" A.I.R. and N.G-A.D. was positive in nature, doing so before they were locked in their unfurnished room, forced to sleep on the floor without blankets, pillows, and adequate clothing, demonstrates Mother's direct involvement in that act. Indeed, A.I.R. recalled telling Mother that

17

she was cold in the bedroom, and Mother did nothing. Mother's argument also does not refute that she failed to timely provide appropriate medical care or seek help for her children other than "sometimes" requesting that Father stop his abusive conduct.

In sum, the substantial evidence in the record that Mother knew or should have known of the abuse occurring in her home "instantly tilts the scales" when weighed against the sparse and unpersuasive evidence to the contrary. Because the evidence regarding factor (c) was alone sufficient to support termination under Section 211.447.5(2), we need not address Mother's contention in this point that the evidence supporting factor (d) was insufficient to support termination under this section. *See D.L.S.*, 606 S.W.3d at 226. *See also B.D.M.*, 587 S.W.3d at 378. The circuit court did not err in terminating Mother's parental rights to K.N.D., D.D.D., and G.N.D. on the basis of abuse or neglect under Section 211.447.5(2). Mother's Point I is denied.

In Mother's Points II and III, she contends the circuit court erred in terminating her parental rights on the grounds of failure to rectify under Section 211.447.5(3), and parental unfitness under Section 211.447.5(5). Because we find that the court did not err in terminating Mother's parental rights on the basis of abuse or neglect under Section 211.447.5(2), we need not consider whether termination was appropriate on the other grounds found by the circuit court. *In Interest of A.C.G.*, 499 S.W.3d 340, 347 (Mo. App. 2016). Mother's Points II and III are denied.

18

***Whether Termination of Mother's Parental Rights was in Children's Best Interest***

In Mother's Point VI, she contends that, even if appropriate statutory grounds existed to terminate her parental rights, the circuit court erred in finding that termination was in the children's best interest. We review the determination that termination of parental rights was in the children's best interest for an abuse of discretion. *J.A.R.*, 426 S.W.3d at 626. To find that the termination of parental rights under Section 211.447.5(2) is in the best interest of the child, Section 211.447.7 requires that the circuit court consider and make findings on the following factors if appropriate and applicable:

> (1) The emotional ties to the birth parent;
>
> (2) The extent to which the parent has maintained regular visitation or other contact with the child;
>
> (3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
>
> (4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
>
> (5) The disinterest or lack of commitment to the child;
>
> (6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

19

(7)  Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

In its judgments, the court found, *inter alia*, that the children have few, if any, positive emotional ties to Mother and, in fact, G.N.D. and D.D.D. have hostile feelings toward her; that Father's deliberate acts of abuse were done with Mother's knowledge and implicit consent, and Mother knew or should have known that those acts subjected the children to substantial risk of physical or mental harm; that Mother and the children have had no contact because that was a condition of Mother's bond in her pending criminal case, and while Mother has sent a few letters to G.N.D. and D.D.D., their therapists recommended that receiving those letters would not be in the children's best interest; that Mother has been unable to show that she can provide safety, proper education, or proper medical and mental health services for the children; and that Mother has committed deliberate acts of abuse and neglect that subjected the children and their siblings to substantial risk of physical and mental harm.

Mother first argues that the finding that Father's acts of abuse were done with her knowledge and implicit consent is factually incorrect because "the evidence suggests that [she] tried to stop the alleged misconduct." As we have already discussed, *supra*, evidence that Mother would ask Father to stop the abuse "sometimes" directly evinces her knowledge of abuse and does not refute her willingness to allow Father's abusive conduct at other times.

20

Mother next argues that there was substantial evidence that retaining her parental rights was in the children's best interest. Specifically, Mother cites evidence that she would pray with the children and that, after the children were removed from the home, she sent them gifts and supplies. Mother's argument ignores our standard of review, which requires us to view the evidence in the light most favorable to the judgment. *P.L.O.,* 131 S.W.3d at 789. Praying with the children and sending them gifts does not negate Mother's abusive conduct, her knowledge of Father's abusive conduct, and her implicit consent to such conduct. The evidence, in the light most favorable to the judgment, showed that the children endured severe and frequent abuse for an extended period of time while in Mother's care. This abuse has had a profound impact on the mental health of all of the children except K.N.D., but only because she was two at the time she was removed from the home. Under these circumstances, the circuit court did not abuse its discretion in finding that termination of Mother's parental rights was in K.N.D.'s, D.D.D.'s and G.N.D.'s best interest. Mother's Point VI is denied.

**Admission of Witnesses' Testimony About Children's Statements**

In Father's Point V, he contends the circuit court erred in admitting the testimony of witnesses describing the five eldest children's out-of-court statements because it was hearsay that did not fall under any exception allowing its admission. We give "substantial deference" to the circuit court's ruling regarding the admissibility of evidence, and we will not disturb the ruling unless we find an abuse of discretion. *Interest of D.S.H. v. Greene Cty. Juvenile Officer*,

21

562 S.W.3d 366, 369 (Mo. App. 2018) (quoting *Dodson v. Ferrara*, 491 S.W.3d 542, 552 (Mo. banc 2016)).

The circuit court admitted testimony about the children's statements under the exception to the prohibition against the admission of hearsay articulated in *In re Marriage of P.K.A.*, 725 S.W.2d 78 (Mo. App. 1987) ("the *P.K.A.* exception"):

> The *P.K.A.* exception "applies to non-jury sexual abuse cases where (1) the best interest of the child is the primary concern; (2) sexual abuse may have occurred, or has been threatened; (3) the child might not be competent or reasonably expected to testify to it; and (4) there is a substantial basis that the statements are true."

*D.S.H.*, 562 S.W.3d at 369 (quoting *In Interest of S.M.*, 750 S.W.2d 650, 654 (Mo. App. 1988)). Courts have since expanded the *P.K.A.* exception to allow for the admission of hearsay statements concerning physical or emotional abuse. *Id.* (citing *In re A.A.T.N.*, 181 S.W.3d 161, 170 (Mo. App. 2005), and *Hord v. Morgan*, 769 S.W.2d 443, 447 (Mo. App. 1989)). The court in *P.K.A.* explained that, "[w]here there is a substantial basis to believe that the statements of the child are true, courts are justified in hearing and considering them to prevent further or potential abuse to the child." *P.K.A.*, 725 S.W.2d at 81. Moreover, even though the child might be qualified to testify, because of the emotional trauma that testifying may cause, "[i]t is desirable to avoid the necessity of forcing a young child to testify as to abuse, particularly when the abuser is the victim's parent." *Id.*

It is undisputed that the best interest of the children was the primary concern of the proceeding, that physical and emotional abuse may have occurred,

22

and that testifying against Mother and Father at trial would be "difficult," "traumatizing," and not in the children's best interest. Moreover, the record demonstrates that the circuit court had a substantial basis to believe that the statements of the five eldest children about the abuse were true. The children's statements about the abuse, while not identical, were consistent with each other and with other evidence, including the pediatrician's examination of N.G-A.D., A.I.R., and G.N.D., and photographs of A.I.R. and the house. Additionally, Porter testified that, during her interviews with the children, the children were consistent in their responses, answered questions spontaneously, and were able to provide time frames, places, and idiosyncratic details.

Father's argument focuses primarily on the testimony about A.I.R.'s statements. He argues that testimony about A.I.R.'s statements should not have been admitted under the *P.K.A.* exception because A.I.R. is only his stepchild. To support his argument, he relies on *D.S.H.*, 562 S.W.3d at 369-72, a case in which the Southern District of this court held that the circuit court erred in admitting the hearsay statements of the child's half-siblings under the *P.K.A.* exception because the half-siblings' statements lacked the "basic trustworthiness dynamics" that "are readily apparent in the context of an alleged abusing parent and his or her declarant child in a proceeding where that parent may maintain or be granted custody of or visitation with that child based upon that child's best interests." *Id.* at 372. Because the half-siblings in *D.S.H.* "ha[d] no parent-child relationship with the alleged abuser, the alleged abuser ha[d] no legal right to or potential for future

23

custody or visitation with the half-siblings, and the half-siblings' best interests [we]re not at issue in the proceeding before the trial court," the court found that the half-siblings' statements could not be deemed trustworthy and, therefore, were not admissible under the *P.K.A.* exception. *Id.* (footnote omitted).

Father contends that, because he was not A.I.R.'s father, hearsay testimony about her statements concerning his abuse was not trustworthy and was, therefore, not admissible under the *P.K.A.* exception according to *D.S.H.* Father makes this argument for the first time on appeal. He points to no place in the record, nor could we find any, where he ever asserted that testimony about A.I.R.'s statements was inadmissible under the *P.K.A.* exception because she was not his child.[7] We "will not convict a trial court of error on an issue that it had no chance to decide." *Interest of C.I.G.*, 616 S.W.3d 758, 764 (Mo. App. 2021).

Furthermore, we see nothing in the record indicating that Father ever objected to the court's consolidating for trial the petition for termination of Mother's parental rights to A.I.R. with the petitions for termination of his parental rights to K.N.D., D.D.D., and G.N.D. This is significant because, unlike in *D.S.H.*, the best interest of A.I.R., the half-sibling of K.N.D., D.D.D., and G.N.D., was at issue in this proceeding. *See A.A.T.N.*, 181 S.W.3d at 170 (affirming admission of

---

[7] Instead, Father's arguments against admitting testimony about any of the children's statements under the *P.K.A.* exception were that he did not receive proper notice of the children's statements, their admission would violate his rights to confrontation and equal protection, and testimony that the children made statements about "demons" lacked a substantial basis for reliability.

24

hearsay statements of half-sibling who was not biologically related to appellant-father under the *P.K.A.* exception, where mother's parental rights to the half-sibling were at issue in the same proceeding), described and distinguished in *Kroeger-Eberhart v. Eberhart*, 254 S.W.3d 38, 43 (Mo. App. 2007).

Lastly, unlike in *D.S.H.*, the potential for Father, A.I.R.'s abuser, to have future custody of or visitation with A.I.R. existed. According to Miller, Mother remained in the home with Father and "was not interested in leaving her husband to work on getting her children back." If the petition to terminate Mother's parental rights to A.I.R. were denied, the potential for Father to have future custody or visitation with A.I.R. existed so long as Mother continued to live with and remain married to Father. The "basic trustworthiness dynamics" that were lacking in *D.S.H.* are present with regard to not only D.D.D., G.N.D., N.G-A.D., and N.L.D., Father's biological children, but also with A.I.R., Father's stepchild. The court did not abuse its discretion in admitting testimony about any of the children's statements under the *P.K.A.* exception. Father's Point V is denied.

**Denial of Motions for a Continuance and to Keep the Record Open**

In Father's Points IV and VI and Mother's Points IV and V, they contend the circuit court erred in denying their motions for a continuance and to keep the record open until after the resolution of their pending criminal cases. At the time of the termination proceeding, multiple counts of felony child abuse or neglect and felony first-degree endangering the welfare of a child were pending against Father and Mother.

After this case was originally set for trial in December 2019, Father filed a continuance motion on November 22, 2019, asserting, among other things, that his right to due process was being denied. He contended that, if he exercised his privilege against self-incrimination, he would not be able "to fully participate . . . in this case because of the criminal trial looming over him in that inasmuch as he has the right to testify in his own defense in this case, he has a right not to testify in his own defense in the criminal trial." Father's continuance motion alleged that a jury trial in the criminal proceeding was set for mid-January 2020; to accommodate that trial, he requested that the trial in the termination proceedings be continued "to a date on or about March 2020." Mother joined in Father's continuance request, and the court continued the case to a date in January 2020. Over the next several months, the case was reset several times until it was eventually set for trial on November 19, 2020.

At the start of trial, Father announced that he had filed a written motion that morning seeking a continuance on the same basis as his prior continuance motion. He reiterated "that we have two parents who are facing criminal charges" and they were unable to testify in the termination proceeding "without risk of jeopardy in the criminal cases." Father asked that the court stay the termination proceeding pending the outcome of the criminal cases. Mother joined in Father's request. The Juvenile Officer and Guardian ad Litem opposed a continuance. In denying the parents' continuance request, the court noted that the case had been set for trial several times since the petitions were filed in May

26

2019.  The court also remarked that the case had been continued at the parents' request in December 2019 and later due to the Covid-19 pandemic.  The court further noted that the criminal cases were not going to be set for trial in the near future and that the children's best interest required the court to move forward and prosecute the termination petitions.  Lastly, the court reminded the parties that this issue had been raised several times in the case and the court had asked the parties to provide authority "one way or the other," but no party was able to find any specific authority.  The trial commenced, and evidence was heard that day and on the next day, November 20, 2020.  The trial was then continued to April 5, 2021, to allow for the appearance of a witness who was unavailable.

After the last witness testified at trial, Father made an oral motion to keep the record open, which he explained was "basically the same request we made at the outset of this trial seeking a continuance of it so as to free [Father] up and be able to defend himself in these proceedings."  Father stated he was "just renewing" the continuance motion and "asking the court to consider leaving the record open for future testimony after the criminal charges are disposed of."  Mother joined in Father's oral motion.  The Juvenile Officer and Guardian ad Litem opposed the motion, noting that Mother and Father had not cited any case law to support it.  After the court was advised that the criminal cases had not been set for trial, the court took Mother's and Father's motion to keep the record open with the case and denied it in the judgment.

We were informed at oral argument that Mother and Father's criminal proceedings remain pending and are currently set for trial in August 2022.

The circuit court has broad discretion in ruling on a motion for a continuance. *In Interest of C.L.L.*, 776 S.W.2d 476, 477 (Mo. App. 1989). The court abuses its discretion "when the ruling is clearly against the logic of the circumstances before it and is so unreasonable and arbitrary as to shock the sense of justice and indicates a lack of judicial consideration." *In Interest of T.M.L.*, 615 S.W.3d 100, 102 (Mo. App. 2020) (citation omitted). Rule 65.03 prescribes the procedure for seeking a continuance:

> An application for a continuance shall be made by a written motion accompanied by the affidavit of the applicant or some other credible person setting forth the facts upon which the application is based, unless the adverse party consents that the application for continuance may be made orally. In any application for continuance made within thirty days of the date the matter is scheduled to be heard, the lawyer shall certify that the party for whose benefit the motion is filed has been consulted, that the party is aware of the contents of the motion, and the party's position with respect to the motion.

"In the absence of compliance with the requirements of the rule, there can be no abuse of discretion in denying a continuance." *C.L.L.*, 776 S.W.2d at 477.

Here, Mother did not file a written motion for a continuance accompanied by an affidavit, and her oral motion was not consented to by the adverse parties. Even if we attribute Father's written continuance motion to Mother, the written motion was not accompanied by an affidavit and did not "certify that the party for whose benefit the motion is filed has been consulted, that the party is aware of

28

the contents of the motion, and the party's position with respect to the motion." Moreover, the parties' oral motion to keep the record open, which was essentially another motion for a continuance, did not meet any of these requirements.

Father argues that "justice demands" that he be exempt from the procedural requirements due to the serious nature of the case, but he does not provide relevant law in support of his argument. Father's argument also fails to explain why his motions failed to conform to Rule 65.03 and why he could not have made them earlier than the morning of the first day of trial and after the last witness testified on the last day of trial.

Because Mother's and Father's motions to continue the case failed to comply with Rule 65.03, the circuit court did not abuse its discretion in denying them. *Id.*; *T.M.L.*, 615 S.W.3d at 102. Furthermore, considering the multiple prior continuances granted by the circuit court and the indeterminate end date of the criminal cases (which had still not been set for trial as of the time of the motion to keep the record open), the court's decision that ruling on the termination petitions without delay was in the children's best interest does not shock our sense of justice or indicate a lack of judicial consideration.

Mother also argues that the circuit court violated her Fifth Amendment privilege against self-incrimination by relying on her refusal to admit wrongdoing in terminating her parental rights.[8] In its finding that Mother's parental rights

---

[8] In her point relied on for Point IV, Mother contends the court violated her right to due process. However, her argument under this point discusses only a violation of her Fifth Amendment privilege against self-incrimination. "An appellant is required to develop the issue raised in the

29

should be terminated for failure to rectify under Section 211.447.5(3), the court found that Mother "refuses to acknowledge that anything was wrong with the treatment of the children." Because we have already determined that Mother's parental rights were appropriately terminated on the basis of abuse or neglect under Section 211.447.5(2), a ground supported by substantial evidence that is independent from this contested finding, we need not address Mother's argument that the finding violated her privilege against self-incrimination. *See In re D.L.W.*, 413 S.W.3d 2, 9-10 (Mo. App. 2012) (abstaining from deciding a similar argument after finding the court did not rely solely on a father's refusal to admit wrongdoing when "other significant evidence" supported the court's termination of his parental rights). Father's Points IV and VI and Mother's Points IV and V are denied.

## CONCLUSION

The judgments terminating Mother's and Father's parental rights to K.N.D., D.D.D., and G.N.D. are affirmed.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

---

point relied on in the argument portion of the brief. If a party does not support contentions with relevant authority or argument beyond conclusory statements, the point is deemed abandoned." *In re S.H.P.*, 638 S.W.3d 524, 533 (Mo. App. 2021) (citation omitted). Because Mother does not support her claim of a due process violation with argument beyond conclusory statements, we will not address it.